## In re BURTON.

No. 4288.   Decided April 28, 1926.   (246 P. 188)

1.  ATTORNEY AND CLIENT—ACTION OF DISTRICT JUDGE IN WRITING LETTER ADDRESSED TO HIMSELF, PURPORTING TO HAVE BEEN WRITTEN BY PARTY TO LITIGATION IN HIS COURT, AND WHICH JUDGE ATTEMPTED TO HAVE SIGNED BY SUCH PARTY, HELD UNJUSTIFIABLE CONDUCT INCOMPATIBLE WITH JUDGE'S DUTIES. Action of district judge in writing letter addressed to himself, purporting to be written by party to litigation in his court, approving his action in dismissing motion for change of judge, and stating that he wished to discharge attorneys and appear in person, and which judge attempted to have signed by such party, *held* to show conduct wholly unjustifiable and incompatible of judge's duties either as court or judge, or an attorney at law, and to show lack of understanding or appreciation of such duties and obligations.

2.  ATTORNEY AND CLIENT—PROCEEDINGS, MERELY ERRONEOUS, WHEREBY DISTRICT JUDGE ARBITRARILY SUSPENDED ATTORNEYS FROM

Original Proceeding

PRACTICE, FURNISH NO BASIS FOR DISBARMENT OF SUCH DISTRICT
JUDGE. If proceedings whereby district judge arbitrarily sus-
pended attorneys from practicing in his court without a hearing
were merely erroneous, though court acted without jurisdiction,
or wholly misconceived remedy or procedure in respect thereto,
they would furnish no basis for a charge in proceedings for dis-
barment of such district judge.

3. ATTORNEY AND CLIENT. Generally, misconduct of attorney, though
   out of his professional dealings as such, may be sufficient to jus-
   tify discipline or disbarment.

4. ATTORNEY AND CLIENT—ATTORNEY MAY BE DISCIPLINED OR DIS-
   BARRED, THOUGH ACTS AND CONDUCT ARE NOT DIRECTLY CONNECTED
   WITH HIS PRACTICE, IF THEY SHOW LACK OF HONESTY, INTEGRITY,
   AND FIDELITY, INDICATING UNFITNESS. Attorney, as member of
   court, may be disciplined and disbarred, though acts and conduct
   are not directly connected with his practice, if they show such
   lack of honesty, integrity, and fidelity as to indicate that he is an
   unfit and improper person to be intrusted with powers and duties
   of an attorney.[1]

5. ATTORNEY AND CLIENT. Power of Supreme Court to deal with
   its own officers, including attorneys, is inherent, continuing, and
   plenary, and exists independently of statute.[2]

6. ATTORNEY AND CLIENT—COURTS, HAVING POWER TO ADMIT ATTOR-
   NEYS TO BAR, POSSESS, AS NECESSARY AND INHERENT INCIDENT OF
   SUCH POWER, RIGHT TO DISBAR THEM FOR IMPROPER CONDUCT.
   Courts, having power to admit attorneys to the bar, possess, as

---

[1]*In re Platz*, 42 Utah, 439, 132 P. 390.

[2]*In re Evans*, 42 Utah, 282, 130 P. 217; *In re Platz*, 42 Utah, 439,
132 P. 390.

Corpus Juris-Cyc. References:

[1]  Attorney and Client 6 C. J. p. 593 n. 85; p. 607 n. 90.
[2]  Attorney and Client 6 C. J. p. 603 n. 19 New; p. 607 n. 90.
[3-6]  Attorney and Client 6 C. J. p. 580 n. 55; p. 582 n. 75; p.
600 n. 78.
[7]  Attorney and Client 6 C. J. p. 601 n. 88 New.
[8]  Attorney and Client 6 C. J. p. 601 n. 84, 84 New.
[9]  Attorney and Client 6 C. J. p. 584 n. 98.
[10]  Attorney and Client 6 C. J. p. 613 n. 58 New.
[11]  Attorney and Client 6 C. J. p. 612 n. 51; p. 613 n. 55 New.
[12]  Attorney and Client 6 C. J. 613 n. 56.

necessary and inherent incident of such power, right to disbar them for unworthy behavior, unprofessional conduct, or moral turpitude, or moral unfitness, independently of authority given by statute.[3]

7.  ATTORNEY AND CLIENT—SUPREME COURT HAS AUTHORITY TO REVOKE LICENSE TO PRACTICE LAW AND BAR ATTORNEY FROM ENGAGING IN PRACTICE, EVEN THOUGH HE AT SUCH TIME HOLDS JUDICIAL OR OTHER OFFICIAL POSITION; BUT EXERCISE OF SUCH POWER DEALS ONLY WITH STATUS OR RELATION OF ATTORNEY AS SUCH (COMP. LAWS 1917, §§ 331, 1786; CONST. ART. 6 § 19; ART. 8, § 11). Supreme Court, under Comp. Laws 1917, § 331, and under its inherent power, has authority to cancel and revoke license of attorney, and bar him from engaging in practice of law, though he, at time, may hold judicial or other official position, notwithstanding that, under section 1786, a judge cannot act as an attorney while in office, and Const. art. 6, § 19, and article 8, § 11, providing for impeachment; but in exercising such power, court deals only with status or relation of attorney as such, and not with respect to any other official position, judicial or otherwise, held by him.

8.  ATTORNEY AND CLIENT—UNWORTHY CONDUCT OF ATTORNEY AT LAW IS AGGRAVATED, WHERE HE IS JUDGE OF DISTRICT COURT. Misbehavior and unworthy conduct of attorney at law in effect amounting to moral turpitude or moral unfitness, done knowingly, wilfully, and contrary to justice, honesty, and good morals, was aggravated by reason of fact that person guilty thereof was at such time judge of district court.

9.  ATTORNEY AND CLIENT—MERE DERELICTION OF COUNTY ATTORNEY BY FAILURE TO PROSECUTE CASES, WHERE EVIDENCE SHOWED COMMISSION OF OFFENSES CHARGED, HELD NOT ENOUGH TO WARRANT DISBARMENT. Mere dereliction of county attorney by failing and refusing to prosecute cases, where evidence was ample to show commission of offenses charged, *held* not enough to warrant disbarment.

10.  ATTORNEY AND CLIENT—ACTION OF DISTRICT JUDGE SUSPENDING ATTORNEYS ACTIVELY OPPOSING HIM DURING CAMPAIGN, CONSIDERED IN CONNECTION WITH OTHER MATTERS SHOWING MORAL TURPITUDE OR MORAL UNFITNESS, HELD TO REQUIRE PRONOUNCEMENT OF SOME SORT OF JUDGMENT AGAINST JUDGE, THOUGH OF ITSELF INSUFFICIENT TO WARRANT DISBARMENT. Action of district judge

[3]*In re Hilton,* 48 Utah, 172, 158 P. 691, Ann. Cas. 1918A, 271.

in attempting to suspend or disbar attorneys who actively opposed him in campaign, when viewed and considered in connection with other matters showing moral turpitude and moral unfitness of judge, *held* to require pronouncement of some sort of judgment in disbarment hearing, though of itself insufficient to warrant disbarment.

11. ATTORNEY AND CLIENT—CONDUCT OF OTHERS, TENDING TO PROVOKE OR INFLUENCE ACTION OF DISTRICT JUDGE, WILL BE CONSIDERED IN DISBARMENT PROCEEDINGS AGAINST HIM IN PALLIATION. In proceedings for disbarment of district judge, acts and conduct of others, which may have provoked or influenced conduct of judge, will be considered, so far as such acts and conduct may be considered in mitigation or palliation of his acts and conduct.

12. ATTORNEY AND CLIENT—MILDER PENALTY THAN THAT OF DISBARMENT WILL BE IMPOSED AGAINST DISTRICT JUDGE, WHERE STATE LEGISLATURE DECLINED TO TAKE ACTION IN IMPEACHMENT PROCEEDINGS, AND SOME OF ACTS COMPLAINED OF HAD BEEN INFLUENCED BY CONDUCT OF OTHERS, AND PARTICULARLY SINCE HE CANNOT PRACTICE DURING TERM OF OFFICE (COMP. LAWS 1917, § 1786). In disbarment proceedings against district judge, where state Legislature had declined to take action on disbarment proceedings, and some of acts complained of were provoked by conduct of others, *held*, that milder penalty than that of disbarment should be imposed, particularly since, by virtue of Comp. Laws of 1917, § 1786, he is suspended from practice of law during term of office as judge.

Original proceeding in the matter of the petition for disbarment of Hon. Thos. H. Burton.

Judgment rebuking and censuring accused, and disapproving and condemning his acts.

*Harvey H. Cluff,* Atty. Gen., *G. Hunter Lunt,* Dist. Atty., of Cedar City, and *W. W. Ray, P. T. Farnsworth,* and *E. A. Rogers,* all of Salt Lake City, appointed by the court for the prosecution.

*Thomas Marioneaux, John Jensen,* and *G. A. Marr,* all of Salt Lake City, for defense.

PER CURIAM.

In this proceeding the disbarment of Judge Thomas H. Burton is sought. In the opinion the judge will be designated the accused. He is now, and at the time of the institution of this proceeding was, a member of the bar of this state, and was the regularly elected, qualified, and acting judge of the Fifth judicial district thereof. On February 28, 1925, William B. Higgins, also a member of the bar of this state, and a resident of the Fifth judicial district, presented to this court a petition charging the accused with certain acts of misconduct. The petition asked an investigation of such alleged acts, and, if found to be true, that the accused be disbarred, and that the certificate admitting him as a member of the bar of this state be canceled.

The petition was referred to the grievance committee of this court. This committee consists of three members. One of the members felt disqualified to act and asked to be, and was, excused from considering the petition presented by Higgins. The committee was requested to advise the court whether, in its judgment, assuming the specifications set out in the petition to be true, the charges were sufficient to authorize or justify disbarment proceedings. The two remaining committeemen submitted a report stating that in their judgment, assuming the charges to be true, the allegations of the petition constituted sufficient grounds to have disbarment proceedings instituted. On the coming in of that report, the court, on June 27, 1925, requested the Attorney General of the state, in connection with the district attorney of the Fifth judicial district, to prepare and file a complaint against the accused, based upon the allegations set forth in the petition of Higgins. The complaint was filed July 23, 1925, and a citation was thereupon issued requiring the accused to appear and answer the complaint within a time designated in the citation. An answer to the complaint was filed August 10, 1925. The matter was thereupon, by order of court, referred to Hon. Elias Hansen, judge of the Fourth judicial district of the state, as referee, to hear the evidence offered in support of the petition and in support of the

answer, and to report the same to the court. The report of the referee was filed with the court and arguments had. The matter was thereupon submitted for decision.

The pleadings are lengthy. The complaint contains numerous detailed specifications of alleged wrongful acts on the part of the accused and covers 30 pages of typewritten matter. The answer is likewise lengthy, denying in detail all the alleged acts of misconduct, and alleging much in explanation concerning the statements contained in the complaint. The taking of testimony extended over a period of 10 days. The volumes containing a transcript of the testimony contain more than 1,300 typwritten pages. It will thus be seen that it is impracticable to attempt, in the limits of an opinion, to recite the contents of the pleadings or of the testimony reported by the referee. The most the court can, or should, attempt to do is to announce its conclusions, and state only such parts of the testimony necessary to a proper understanding of the opinion and views of the court.

The accused was elected judge of the Fifth judicial district of the state of Utah at the general election in 1924, and is now the regularly elected, qualified, and acting judge of that district. By appointment of the governor of the state made July 6, 1923, the accused held the same office prior to the general election of 1924.

In Washington county, in the Fifth judicial district, at the April, 1924, term of the court presided over by the accused, there was pending an action for divorce, wherein Edna M. Schultz was plaintiff and Frederick S. Schultz was defendant. Willard Hanson and Higgins, attorneys at law, then represented Schultz in the action. Among the charges against the accused is the charge:

That he, during such term of court, advised Schultz that Hanson could not practice in the court presided over by the accused, to discharge his counsel, and come into court without counsel, and that the accused would see that the interest of Schultz was properly protected; consulted with other counsel to represent Schultz, and stated to Schultz that, if

any matter pertaining to the case came up, to see the accused or write him about it instead of consulting with his counsel; that the accused conferred with another counsel and requested him to prepare an answer in the case for Schultz and to get him to sign it and bring it in chambers and lay it on the desk of the accused, and if Higgins said anything about it or asked where it came from, the accused "would tell him that he found it;" that the accused advised Schultz that he ought to give his wife a divorce and not make any contest, when in truth and in fact she had no grounds for divorce and as was later evidenced when the case was tried and disposed of on the merits by another judge, who found and adjudged that Mrs. Schultz had no cause of action and dismissed her complaint; that while the demurrer to the complaint and a motion to modify the restraining order tying up all of Schultz's property were pending and undisposed of, a motion supported by affidavits was filed by Hanson as counsel for Schultz for a change of judge; that the accused wrongfully and arbitrarily denied the motion, and thereafter, in the absence of Hanson, who was then the only counsel of record for Schultz, permitted counsel for plaintiff to examine Schultz concerning the motion to modify the restraining order; and that, upon an intention being indicated to procure a transcript of the proceedings to have reviewed the ruling denying the motion for a change of judge, the accused, during such term of court, with a "wicked and unlawful purpose and design to hinder and oppress said Hanson and Higgins, attorneys for the said Frederick S. Schultz, unlawfully and maliciously prepared a letter addressed to himself as judge, purporting to have been written by said Frederick S. Schultz, which said letter in words and figures is as follows:

" 'In the Fifth Judicial District Court of the State of Utah in and for Washington County.

" 'Edna M. Schultz, Plaintiff, v. Frederick S. Schultz, Defendant.

" "To the Honorable Thomas H. Burton: I desire, if it please your honor, to make a free and voluntary statement in my own behalf in the above-entitled action:

Original Proceeding

" 'On the 6th day of October, 1923, my wife brought a suit against me for divorce in this court. On the 8th day of October, 1923, I was served with an order to show cause, and a restraining order, and all my property was tied up, and I was prohibited from going to my own home, and I had no money to carry on my business.

" 'On the 13th day of October, 1923, I employed Hon. D. H. Morris, and he entered into a stipulation with my wife's attorney to have the order modified, which was done, and I was given $3,000 to carry on the expense of running my business.

" 'On October the 7th, 1923, I was served with a summons. Later I hired Hon. W. F. Knox, and on December 7, 1923, he entered into a stipulation whereby the order was again modified, and I was directed to pay $500 to my wife's attorneys, $500 suit money, $300 for medical expense for my baby, and $150 per month alimony. It also provided that I should also see my child at St. George, Utah, at all reasonable hours. Soon after my wife took the child to California, and since her return has prevented me from seeing the baby until I saw it when your honor made an order that the baby be brought to the courtroom on the 17th of April. Later on, the order was changed again to permit me to occupy the house while my wife was away; later on the order of December was restored. The case seemed to me it was kept out of court for some reason and was being delayed and I was eternally digging up money for attorneys on both sides, suit money and other expenses, and for some reason I could get no action.

" 'I discharged W. F. Knox and paid him off and went to Fillmore to see Mr. William B. Higgins. I employed him and entered into a written contract with him. He sent me to Salt Lake City to see Willard Hanson, who, he said, would be associated with him, but that he, William B. Higgins, was not to be known in the case.

" 'I saw Mr. Hanson and he made out an application for a modification of the order and I was informed that the same was presented to your honor at Fillmore in March, and that you had denied it, and I did not know any better until I heard your statement and order made in court on the 17th of April, 1924.

" 'I was told that you were biased and prejudiced against me, and that you were standing in with my wife and her attorneys, and that you had made to them promises, and I was induced through these representations to file in this court an affidavit alleging that you were biased and prejudiced against me. I must say that I was very much surprised when I saw you on the bench and saw how fair and impartial that you were, and I discovered that I had been grossly deceived. It then appeared to me that the change of judge asked for was for no other purpose than to delay the case "in order to bleed me further in the matter."

In re Burton, 67 Utah 118.

" 'I came into court on the petition filed by Mr. Hanson and the court gave me all that I asked for. What more could I ask and I was not asking anything unreasonable? The court denied the motion, for the change of judge, and rightly, too.

" 'I now desire to ask permission to withdraw the affidavit I filed in the case, wherein I stated that the judge was biased and prejudiced against me. I appreciate the fact that the property belongs to both my wife and me, and it appears to me we are both being robbed. I have lost faith and confidence in some attorneys and I can see nothing else than to discharge my attorneys and place myself at the mercy of the court. I have discharged my attorneys and I have no attorney at this time. I desire to appear in my own behalf and I hereby consent and request that the demurrer heretofore filed be withdrawn, and I hereby waive time in which to answer, or otherwise plead, to the complaint, and consent that my default for failure to answer be entered and that the court, if it shall decree that my wife is entitled to a divorce, divide the property in a just and equitable manner.

" 'The property described in the complaint, which it is alleged that I am the owner of, is incorrect, and therefore in consenting that my default be entered, I do not wish to be understood as admitting that I am the owner of all the property alleged therein, neither do I consent that the property be divided as therein indicated or suggested.

" 'I am attaching hereto a list of my property, together with a list of my debts and obligations, which the court is at liberty to use in making a division of the property.

" 'Dated at St. George this 21st day of April, 1924.
" '_____,' "

It is further alleged that the accused then well knew that Hanson and Higgins were counsel for Schultz (although Hanson was the only counsel of record); that the accused sought to have Schultz make false accusations against his counsel and to their detriment and injury, and after preparing the letter, without the knowledge or consent of Schultz, the accused "wilfully and stealthily" sought to have Schultz sign it, but Schultz declined to do so. The accused, by his verified answer, in substance denied writing the letter or any part thereof and denied the material parts of the charge and pleaded matters in explanation of the averments contained in the charge.

To understand the significance and pertinency of this matter, it is necessary to refer to the prior proceedings in

the divorce action as shown by the record. That action was commenced in October, 1923. Schultz, a resident of St. George, was in the sheep business. He was alleged to be the owner of a band of about 7,500 head of sheep and sheep outfits and equipment of the value of about $70,000; a sheep ranch of the value of $20,000; and other real estate of the value of about $26,000. Upon the filing of the complaint, and upon an ex parte application of the plaintiff, the court presided over by the accused, on the verified complaint alone, granted what the accused later termed a "drastic" and "severe" restraining order restraining Schultz from withdrawing any money from the bank, or selling, incumbering, or otherwise disposing of any of his sheep or other personal property or any of his real estate, and from collecting any moneys due him, and from visiting his home or talking to his wife or visiting with his minor and invalid child. The restraining order prevented Schultz from carrying on his business or paying any of the necessary expenses connected therewith, especially in caring for and running the sheep. He immediately employed counsel to get the restraining order released or modified and to defend the action. His counsel filed a general demurrer and a motion to modify the order. On December 7, 1923, the order was modified permitting Schultz to receive moneys from sales of lambs and wool theretofore sold, but requiring him to pay $5,000 of such proceeds in a bank at St. George to be there held during the pendency of the action and to be disbursed by the court on the final settlement, pay the plaintiff $150 a month temporary alimony, $500 on account of attorney's fees for plaintiff, and $500 suit money, and permitting him to use the balance of such proceeds of sale, but to keep and report to the court an accurate account of all moneys expended by him, and permitting him to see his child in the presence of a nurse. About a month later, it being made to appear to the court that the plaintiff had gone to California and had taken the child with her in violation of a prior order that she was not to take the child out of the jurisdiction of the

court, the court modified the restraining order permitting the defendant during the absence of the plaintiff to occupy the home. The plaintiff returned with the child in about a month and a half thereafter, whereupon the court again modified the order requiring the defendant to vacate the premises. Schultz, complaining to his counsel and to the judge that the restraining order prevented him from carrying on his business and that he had suffered and was suffering great loss in consequence of it and becoming dissatisfied with his counsel in not getting matters more speedily disposed of and because they had advised him, so he testified, to let his wife take a divorce and let the court adjust their property rights which Schultz was unwilling to do, paid off and dismissed his counsel and employed Willard Hanson, of Salt Lake City, and Higgins, of Fillmore, to represent him in the action; but Hanson thereafter, at least until the case came on for trial, appeared alone as counsel of record for Schultz. As soon as Hanson was employed, he, on March 1, 1924, prepared and filed a petition on behalf of Schultz to modify the restraining order, especially in the particular that Schultz be permitted to take $4,000 of the moneys on deposit in the bank to pay off a mortgage on real estate owned by him in California and to use the rest of such funds in running and caring for his sheep, and that he be permitted to go to his home to get clothing and other personal effects and to visit with his child and talk with the plaintiff concerning its welfare and on business matters in which they were both interested.

Evidence was given to show, and as was shown by considerable correspondence passing between the accused and Hanson, that a strained relation existed between them; Hanson claiming that the accused had asserted that he felt inclined to modify the restraining order in the Schultz case, but would not do so if Hanson represented him, and complaining of wrongful conduct of the accused in other cases in which Hanson appeared as counsel, and asserted that the accused was prejudiced against him and because thereof

Hanson could not, in justice to his clients, permit the accused to hear and dispose of cases in which he was interested, and that he felt constrained to take whatever legal action he could to prevent the accused from hearing any case in which Hanson appeared as counsel, and, if necessary, would file affidavits of facts showing the disqualification of the accused; and other evidence was given to show that the accused had asserted that Hanson could not practice in his court.

The relation between the accused and Higgins also was strained. The accused, before he was appointed to the bench, was county attorney of Juab county during a portion of the time that Higgins was district attorney of the district which included Juab county. During that time each accused the other of transgressing upon the prerogatives of the other, which caused considerable friction and ill feeling between them. The strained relation existed when the accused was appointed on the bench. Both Higgins and the accused are members of the same political party. Both in the fall of 1924 were candidates for nomination to the office of judge of the district. The accused was nominated. Higgins then ran as an independent candidate. The accused was elected. Considerable feeling and bitterness was engendered between the principals and their friends during the campaign. The strained relation grew and was intensified, which more or less affected the trial of cases in which Higgins appeared as counsel. After the election, without the filing of any charge or a hearing, the accused attempted to suspend Higgins from the practice of law. The order made by the accused in such respect was, on review, annulled by this court. At the last session of the Legislature of the state Higgins, before that body, preferred charges of impeachment against the accused as judge. They were dismissed by the judiciary committee of the house to whom the charges were referred. Thereafter these proceedings were instituted by Higgins.

6

About a month after Hanson had appeared in the Schultz Case and filed the petition for a modification of the restraining order, he filed a motion for a change of judge and an affidavit in support thereof setting forth that he was counsel in the case for Schultz and the only counsel of record appearing for Schultz; that a petition had been filed seeking a modification of the restraining order; that a demurrer to the complaint was pending and undisposed of, and prayed for a change of judge upon the ground that the accused was prejudiced and biased against Hanson and for that reason could not fairly and impartially hear and try any of the proceedings in the case. The affidavit consisted of about 15 pages of typewriting setting forth instances of alleged misconduct on the part of the accused as judge in prior cases in which Hanson as counsel had appeared and was interested. At the same time an affidavit was prepared by Hanson and signed by Schultz, consisting of 5 pages of typewriting and filed in the case, in which was set forth that the accused was biased and prejudiced against Schultz; that the accused after the petition to modify the restraining order was filed and before it was heard, asserted to divers and numerous persons that he would not modify or in any way change the restraining order and would not grant Schultz any relief asked for in the petition to modify the order, because of the accused's bias and prejudice against Schultz and his counsel, Willard Hanson; and that Shultz could not have a fair and impartial hearing before the accused.

When the court convened to take up the April term and when the motion to modify the restraining order was called, Higgins, for and on behalf of Hanson, who was absent, presented the motion for a change of judge supported by the affidavits theretofore filed by Hanson and Schultz. The motion was opposed by counsel for Mrs. Schultz, but no counter affidavits were filed. The court denied the motion. In doing so considerable feeling and resentment was manifested by the judge, who criticized the filing of the motion and the affidavits and rebuked counsel for so doing, and stated:

That the court was not prejudiced or biased against any of the parties, nor any of the attorneys, and wanted "all of the attorneys to understand that this court is here to do justice between the parties and nothing short of justice.   *   *   *   There is no judge that desires to sit in a case where the litigants that [think or believe] they cannot have a fair and impartial trial.   The affidavits here accuse the judge, counsel has accused the judge, and there have been accusations in respect to this case until I think it has become notorious.   There are charges made here in a letter that are contemptuous in extreme; that this court has met with the plaintiff and her attorney and settled the case.   This court would not know the plaintiff if she were in the courtroom at this time; I have never seen her, and such charges are contemptuous; such charges are wrong; and if the court gets hold of certain letters somebody is going to be punished for contempt.   *   *   *   The defendant has filed a demurrer to the complaint, and for cause of demurrer alleges that the complaint does not state facts sufficient to constitute a cause of action.   At this time the demurrer will be over-ruled and denied.   *   *   *   I have received letters here containing statements and charges that, if they are true, make a lot of people guilty of contempt of court.   I would file the letters I have received here today, but I do not believe that it would be right, because I do not believe that the statements charged are true."

Then, after reviewing the prior proceedings had in the case, especially those relating to the restraining order and the pending motion to modify it, and after reading into the record portions of the motion and the affidavits in support thereof, including the statement that Schultz had employed Hanson, who was the only counsel of record representing him, the court further observed:

"It seems to me that there has been some grave injustice done here and I want an order issued right now for that woman [the plaintiff] to produce that baby here in court today.   I want to see whether the orders of this court can be violated with impunity.   And I want that baby here at 1 o'clock.   You will see to that, Mr. Schulder [counsel for plaintiff].   Now, this man is a sheep man, and he has been handicapped, it appears, by the orders of this court, and I want to be advised as to the matters.   The defendant, I believe, has been advised of things that are not right and that are wrong.   From the complaint it appears that the defendant is a very wealthy man.   All of his property is tied up, and I don't know how he can run sheep with that kind of a restraining order over him.   There is a good deal of property, and it is to the interest of both parties that it be protected.   It appears that the

restraining order is such as to prevent the proper handling of the property. There is a petition for a modification of the decree [order]. This court has never had a chance to go into the matter; there have always been stipulations, and the court hasn't had an opportunity to hear any testimony, and it seems that somebody wants to find fault with the orders made and with the court."

After colloquies had between the court, counsel for Mrs. Schultz, and Schultz himself, a recess of court was taken till 2 o'clock in the afternoon. When the court reconvened at that time these proceedings were had:

"The Court: The record may show that plaintiff and defendant are both in court, and that the plaintiff is represented by counsel, Mr. Schulder appearing as plaintiff's attorney, and I presume that the defendant represents himself.

"Mr. Schultz: It rather looks that way.

"The Court: Are you ready to have this matter presented at this time, Mr. Schultz?

"Mr. Schultz: Well, yes; I think it is all right.

"The Court: The record may show that the defendant is in court and consents to a hearing on the motion to modify the restraining order."

Then the court observed that, as he took it "from the complaint, the defendant is tied up in everything."

Counsel for plaintiff stated that, as he understood the matter, the petition sought a modification only as to the $5,000 in the bank, and that Schultz desired to use $4,000 of that to pay off a mortgage in California, and that he had no objection to that, but that he did object to the release of any other property.

"The Court: (Addressing Schultz) : As I understand it, Mr. Schultz, you are asking to see the baby?"

Schultz, in substance, replied that he did, and "I would like to set aside the order so it would put me in a position where I can turn with my business. As far as the alimony goes, it is too high."

"The Court: Are you ready to try the case while the court is here?

"Mr. Schultz: No. I would have to get depositions from California."

Counsel for Mrs. Schultz stated that there was no objection to Schultz seeing the baby at any time.

"The Court: If that condition exists, that he cannot see that baby, the court is going to modify it.

"Mr. Schulder: All he needs to do is to designate the time that he wants to see it.

"The Court: The court is inclined to believe that it [the order] should be modified. I don't think he is asking anything unreasonable, and it seems to me that he is entitled to a modification."

Counsel for plaintiff then observed that before the court made a ruling he desired to examine Schultz, and thereupon Schultz was asked to be sworn and take the stand and was examined by counsel for Mrs. Schultz. At the conclusion of the examination, and upon further colloquies between the court and counsel for plaintiff, the court observed that Schultz testified he had no money to pay off the mortgage, and that he had nothing with which to run his sheep because his property was tied up, and that "I think the restraining order in the first place was too drastic," and "seems severe. Of course, he has got to pay $150 a month alimony. That is pretty good alimony. He has got to go to a hotel to live. He has got to have money to run his business, and he says he hasn't a thing. I think the order should be granted. I think he should have the $4,000 to clear that mortgage. I don't think that is asking too much. I think it is reasonable."

The court further stated: "The court will make an order that this man can see his baby at any reasonable time, and she [plaintiff] is prohibited from taking the baby away from here. I want it to be understood that I don't want to hear any more about hiding that baby either.

"Mr. Schulder: There is no hiding.

"The Court: Well, that is made to appear to the court from the affidavit. It may not be true.

"Mr. Schulder: It isn't.

'The Court: I want it understood now that it has got to stop.

"Mr. Schulder: Was the $300 [for back alimony] allowed?

"The Court: All you want is to see the baby?

"Mr. Schultz: Yes.

"The Court: And you want the money released so—

"Mr. Schultz: I would like to have the alimony cut down. I don't see how I can pay it.

"The Court: Well, I can't try the case now unless you are ready.

"Mr. Schultz: I went all over California to get evidence to offset the complaint, and, for that reason, I will have to get depositions.

"The Court: I will tell you what I will do. I will come back here and hear the case. I will go to Nephi and adjourn the term somewhere else in order to came back here and hear the case if you people can make the arrangements.

"Mr. Schulder: When Mr. Schultz is ready to hear the case we could accommodate ourselves to his time.

"The Court: I want to get through the case. I will go to Nephi and come back and try it. At this time the order will be made amending

In re Burton, 67 Utah 118.

the former order, the stipulated order. The defendant may have and use the sum of $4,000 to pay the mortgage and he may have the order [other] thousand dollars in the bank for the purpose of carrying on the business. It is to your advantage, and to everybody's advantage. This court is not going to permit this property to go to ruin. I am going to see that it is taken care of and preserved. The order may be entered."

Upon further colloquies between the court, Schulder, and Schultz, the court announced an oral ruling that Schultz, out of the moneys on deposit, could use the $4,000 to pay off the mortgage, pay $300 on back alimony, and use the balance in his business. But when the written order was signed and filed it did not permit Schultz to use any of the moneys for his business. The case, however, when tried, was not tried by the accused, but by another judge, who, on a hearing on the merits, found against Mrs. Schultz and dismissed her complaint.

We have thus recited these proceedings, not for the purpose of reviewing them, but to show the circumstances which led up to and under which the accused wrote the letter heretofore set forth and as purporting to have come from Schultz and the purpose and motive of writing it and getting Schultz to sign it.

After these proceedings were had the accused prepared the letter hereinbefore referred to, and within three days thereafter delivered it to Gordon Whitehead, cashier of the bank at St. George at which Schultz did business, and who was friendly to both the accused and Schultz, with the request that Whitehead present the letter to Schultz and get his signature thereto and then return it to the accused. Notwithstanding the accused by his verified answer having denied that he wrote the letter or any part thereof, nevertheless at the trial hereof testified that he prepared and wrote the whole of the letter down to the words "I appreciate the fact," etc., and that he delivered it to Whitehead to get Schultz to sign it, but further testified that he did so because Schultz, after the proceedings referred to, privately came to him and said that he had discharged

his counsel and desired to withdraw the affidavits filed for a change of judge. Schultz denied any such visit or statement to the accused, and denied that the letter, or any part thereof, was prepared or written with his knowledge or consent or at his suggestion or request. The evidence, without dispute, shows that, when the letter was presented to Schultz by Whitehead, Schultz took it to the clerk of the court at St. George, who made a copy of it, and that Schultz then mailed a copy thereof to Hanson and returned the original to Whitehead unsigned and declined to sign it. It further is made to appear by the overwhelming weight of the evidence that the accused, on his own initiative, and without the knowledge, consent, or advice of Schultz, wrote the whole of the letter as hereinbefore and in the charge set forth, except the last paragraph thereof which he dictated to Whitehead at the time he delivered the letter to him, and which at such dictation was at that time added to the letter by Whitehead. Before the judiciary committee of the Legislature the accused, in substance, admitted that the letter as it is here and in the charge set forth was prepared and written by him, except the last paragraph thereof. That the letter was prepared and delivered by the accused as so exhibited was testified to by Whitehead and by the clerk of the court as a true copy made from the original given him by Schultz and by Hanson as a copy mailed to him. The accused at this hearing produced a copy of a letter which in language was the same as the letter hereinbefore referred to down to the words "I appreciate the fact," and testified that such was a copy of the letter which he had prepared and delivered to Whitehead to get Schultz to sign, and testified that he produced and exhibited a copy of such a letter before the judiciary committee. But in that he was disputed by Whitehead and by the chairman and three other members of the judiciary committee and was not corroborated by any of them. The testimony of the accused, not only respecting such document and the circumstances under which it was prepared, and concerning many other issues in the case,

was evasive, uncertain, and lacked candor and frankness. His testimony, that Schultz, after the hearing and the ruling on the motion for a change of judge privately came to him and informed him that Schultz had discharged his attorneys and desired to have the affidavits for a change of judge withdrawn, and that the accused prepared the letter as the result of such conference, is in conflict with all the facts and circumstances of the case. The accused knew that Hanson was the attorney of record for Schultz; that he, as such, had filed the motion or petition for a modification of the restraining order and a motion and affidavits for a change of judge, and that an intention was manifested to have the ruling denying the motion for a change of judge reviewed. Even upon the assumption that Schultz came to the accused after the ruling was made and expressed a desire to have the affidavits withdrawn as testified to by the accused, and as the result thereof he wrote and delivered to Whitehead to get Schultz to sign even the kind of letter which the accused testified he wrote and delivered for such purpose, shows conduct on his part wholly unjustifiable and incompatible with the accused's duties as a court or judge or an attorney at law, and a lack of understanding or appreciation of such duties and obligations. If, as claimed by the accused, Schultz came to him and desired that the affidavits be withdrawn, propriety and his duties in the premises, if he was disposed to permit a litigant in the absence of counsel to discuss such a matter with him, would have suggested the reply that the affidavits could be withdrawn, if Schultz and his counsel were so advised and desired and that the court would entertain a motion for such purpose. There was in such case no occasion on the part of the judge to write or deliver anything to Whitehead with a request that he get Schultz to sign it, much less to make statements which admittedly were made in the letter and delivered by the accused that—

"I was told that you were biased and prejudiced against me, and that you were standing in with my wife and her attorneys, and that

you had made to them promises, and I was induced through these representations to file in this court an affidavit alleging you were biased and prejudiced against me. I must say that I was very much surprised when I saw you on the bench and saw how fair and impartial that you were, and I discovered that I had been grossly deceived. It then appeared to me that the change of judge asked for was for no other purpose than to delay the case 'in order to bleed me further in the matter.' I came into court on the petition filed by Mr. Hanson, and the court gave me all that I asked for. What more could I ask, and I was not asking anything unreasonable? The court denied the motion for the change of judge, and rightly, too."

From the remarks and statements made by the court on hearing and considering the motions for a change of judge and to modify the restraining order; that the order was "drastic" and "severe;" that the property of Schultz was unreasonably tied up; that the property must and will be protected; that grave injustice had been done; that the request of Schultz to modify the order was not unreasonable; that the baby must at once be brought in court and rebuking the plaintiff for "hiding" and withholding it; that the court was going to see whether its orders in such respect could be violated with impunity; that the alimony was high; that in effect Schultz had been misled and deceived as to the court's attitude toward him and indicating an intention to give Schultz all that he asked, it would seem that the court went out of his way to show Schultz that the accused was not prejudiced or biased against him and to impress him that by filing his affidavit that the accused was prejudiced and biased and would not favorably or fairly consider his petition to modify the order he was misled and deceived. And the statement in the letter just referred to and admittedly made by the accused seems to be in harmony with the same thought and purpose.

In response to questions propounded to the accused on the witness stand why, when Schultz came to him, he did not tell him to inform his counsel that the accused would consider a motion for a withdrawal of the affidavits, he merely answered that he did not know; and upon being

In re Burton, 67 Utah 118.

further asked the theory upon which he, as judge, took upon himself to prepare a written statement for Schultz to sign rather than refer him to his counsel, the accused again but answered that he did not know; and when asked why, instead of delivering the letter to Whitehead for Schultz's signature and not to Hancock, an attorney whom the accused testified had come into the case after the rulings on the motions, he merely replied, "I don't know; just happened to be that way, that's all," and further answered that he did not know why Schultz desired to secure a withdrawal of the affidavits. It further was made to appear that the accused conferred with Hancock with a view of his appearing in the case for Schultz and to prepare an answer to the complaint with the stated purpose of at once disposing of the main case. An answer was prepared for Schultz by Hancock, but Schultz refused to sign it, and thereupon, at the instance and request of the accused, Hancock delivered the unsigned answer to the accused, who stated that, if Higgins inquired where it came from, the accused would say he found it on his desk.

On the record it is clear that the accused, not on the bench, but off the bench, on his own initiative, and without the knowledge, consent, or advice of Schultz, knowingly and wilfully wrote the whole of the letter as set forth in the charge, except the last paragraph, which he dictated to Whitehead, and delivered it to Whitehead, and requested him to get Schultz to sign it, and when signed to deliver it back to the accused, with the purpose and motive to thereby forestall, if he could, any successful application to have reviewed the ruling denying the motion for a change of judge; to lay a foundation whereby he might cause Hanson and Higgins to appear before the court to answer a charge of contempt for filing the affidavit by Hanson for a change of judge, deceiving Schultz and inducing him to make and file a false affidavit that the accused was biased and prejudiced, and for other matters contained in the affidavits, or otherwise plenarily to deal with Hanson or Higgins, or both,

Original Proceeding

or to suspend or prevent Hanson from further appearing in the court presided over by the accused until Hanson had purged himself of the matters and things alleged in his affidavit; to induce Schultz to dismiss Hanson and Higgins as his counsel and to either employ other counsel or to appear in person on his own behalf in all further proceedings in the case; and to injure Hanson and Higgins in their standing and influence as members of the bar and to deprive them of business coming before the court presided over by accused.

Another charge relates to this: Because of the strained relation and feeling existing between the accused and Higgins, the latter, who then also was district attorney, requested the accused to call in another judge to hear and try all civil cases before the court in which Higgins appeared as counsel. Among other civil cases pending before the court in which Higgins appeared as counsel was the case of the Virgin Dome Oil Company v. W. J. Graham, in which Higgins appeared as counsel for the plaintiff. While the case was pending, the accused, again off the bench wrote one of the officers of the oil company whom Higgins was representing as counsel as follows:

Parowan, Utah.

"Sam Judd, St. George, Utah.—Dear Mr. Judd: It was my intention to send another judge to St. George for this term. Higgins requested it, and however much I dislike to break into my work all the time I thought I would do it this time, in the interest of harmony. Higgins has now filed a complaint with the Supreme Court to have me disbarred. This complaint has now been filed with the grievance committee of the State Bar Association. The complaint contains the same charges as he used in the election and before the Legislature. It may be that I will not call in another judge. I am having trouble to get a judge to go to St. George. Judge Knox was telling me that you are not feeling well. I hope you are better.

"Yours very truly,

"[Signed]  Thos. H. Burton."

"P. S.  I will leave here Saturday and go to Nephi."

In response to questions asked him why he wrote the letter, the accused stated he wrote it partly because of a letter

which he had received from the officer of the company requesting the accused not to grant a change of judge and partly because the accused was incensed at Higgins instituting these proceedings. He was unable to produce the letter which he claimed he received from the officer of the company because, as he testified, he, at the request of the officer, returned it to him. But in the letter admittedly written by the accused no reference is made to any letter from the officer of the company, nor as to any request from the officer that a change of judge be not granted. On the record it is apparent there was no good reason for writing the letter and that it was written by the accused to injure the standing and influence of Higgins with his client, and to suggest or create in the mind of the company the propriety or wisdom of permitting Higgins to further represent the company in the case pending before the court. However, the accused did in this case, as he did in the Schultz Case, call another judge to try it. But above all, the accused in no particular seemed to appreciate the impropriety of taking up such matters and discussing them with a litigant represented by and in the absence of counsel, nor did he seem to sense the impropriety of discussing the matters admittedly discussed by him with Schultz or writing the letter and making the statements therein as admitted by him and delivering the letter to Whitehead to get Schultz to sign it, and apparently justified and defended all that he did in such respect.

Among other specifications relied on as showing the unfitness of the accused to be a member of the bar are his acts in suspending from the practice of the law William B. Higgins and John M. Foster. Both Mr. Higgins and Mr. Foster were members of the bar in good standing, and were practicing in the Fifth judicial district. Mr. Higgins was at that time district attorney of that district. Mr. Foster was city attorney of Cedar City, in Iron county. During the campaign that immediately preceded the general election of 1924 many charges of wrongdoing and many incriminations

had been indulged in by the candidates for the office of judge of that district. Beginning on November 12, 1924, following the general election, the accused held a term of court at Parowan, Iron county, in the Fifth judicial district. The record of the proceedings of court at that time and place indicates that the judge proceeded on his own motion to make the orders of suspension. The record shows as follows:

"The Court: So that there may be no misunderstanding, the court has heard some slanderous charges that have been made and circulated by some of the attorneys at the bar of this district  *  *  *  and the court does not wish to hear from those attorneys, and will not hear from them further until the committee which this court will appoint shall have investigated these charges. The court appointed Mr. Sam Cline, Mr. T. M. Ivory, and Mr. Claude Baker. Some slanderous statements were made attacking the court and, not that I care personally, but some slanderous statements have been published in the papers. They were signed by the city attorney of Cedar City, and the court will not hear from the city attorney any further. Some further charges have been made by the district attorney, and the court does not care to hear from the district attorney any further."

On November 13th following the above remarks of the accused as judge of the court, a formal order of suspension was made against both Higgins and Foster denying them the right to appear in any civil action until the committee named had made its report. The act of the accused in thus denying the right to these attorneys to practice was, by order of this court, annulled, and apparently no further proceedings were had in the matter. That the accused, as judge, acted without authority and arbitrarily in suspending, or attempting to suspend, these attorneys without a hearing and for something not committed in the presence of the court, is the effect of the opinions of this court in *Higgins* v. *Burton,* 64 Utah, 562, 232 P. 914, and *Foster* v. *Burton,* 64 Utah, 550, 232 P. 917, to which reference is hereby made. If such proceedings were mere error, or though the court therein acted wholly without jurisdiction, or wholly misconceived the remedy or procedure with respect thereto, they, of course, would furnish no basis for a

charge in this investigation. But the claim made is that the accused, with others, instituted such proceedings in bad faith and to "give vent to his spleen" against Higgins and Foster because they had actively opposed him and made speeches against him in the campaign, and in bad faith appointed avowed enemies of Higgins and personal friends of the accused and partisans in the controversy to investigate the charge, one of whom had nominated the accused at the judicial convention, and two of whom represented and defended the accused when the proceedings were reviewed in this court, and that the proceedings were instituted through a conspiracy of the accused and others to injure Higgins and Foster and destroy their standing as members of the bar. Considerable evidence was given to support such claim and contention, and the evidence adduced by the accused, including his own testimony, with respect thereto is, to say the least, unsatisfactory. There, however, is this much to be said about the charge: The alleged matters largely grew out of a bitter and personal campaign waged between the accused and Higgins and their friends for the office of judge of the district and in which charges of crimination and recrimination were freely indulged, and where the victor undertook to punish the vanquished for things said and done in the campaign by the latter against the former. In his verified answer the accused averred that he, by correspondence and otherwise, was importuned and requested by a large number of attorneys of the district to take the course which he did; but the averment neither in substance nor effect is supported by the evidence.

Another charge relates to the conduct of the accused while he was county attorney of Juab county and Higgins district attorney, with respect to the accused's failure and neglect to prosecute one George Sly and Bertha Peterson for a "heinous crime" committed by them upon a young daughter of Bertha Peterson. In such respect it is charged that the accused, while county attorney, with full knowledge of the facts to warrant a prosecution and conviction of the parties

for felony, permitted them to be charged before a juvenile judge with the misdemeanor of contributing to "juvenile delinquency," and, though requested so to do, failed to institute any proceedings or to prosecute the parties for the commission of a felony; that complaints were made because of the failure to so prosecute the parties, whereupon Higgins, as district attorney, instituted such proceedings and caused the parties to be bound over and held to answer on a felony charge, but that the accused in such proceedings and prosecution, refused to aid the district attorney; that when the case came on for trial in the district court a necessary and material witness on behalf of the state was absent and in the state of California, but, in response to a telegram sent her by the district attorney, the witness replied that she would come to Utah and be a witness for the state if her traveling expenses were paid; that thereupon the district attorney requested the accused, as county attorney, to ask the county commissioners to advance sufficient funds to enable the witness to appear, the commissioners not being willing to advance such funds unless the accused, as county attorney, advised or recommended it, but the accused, as county attorney, declined and refused to request or recommend the advancement of such funds, and for such reason such funds were not advanced, and the district attorney not enabled to procure the attendance of the absent witness; that the accused, as county attorney, refused to assist the district attorney in the prosecution of the case, and on the trial used every means within his power to prevent a fair trial of the case, attempting even to engage counsel to represent the defendants, stating at the time that there was not sufficient evidence to convict them, and suggested to their counsel that, if the defendants would plead guilty to simple assault a dismissal could be procured of the felony charge; that because the district attorney, for the reasons stated, was unable to procure the attendance of the absent witness whose testimony was necessary to a successful prosecution and a conviction on the felony charge, and, over the objections of the

defendants, was unable to get the case continued, the district attorney was compelled to dismiss the felony charge; and that thereupon the accused, instead of having the parties plead guilty to a charge of simple assault in the district court at Nephi, where the case was pending, accompanied the parties and took them before a justice of the peace at Eureka, where they were charged with simple assault and a fine of but $10 imposed.

Much evidence was adduced concerning this charge. There was evidence to show a most revolting case, one where the mother of the child, through moral depravity or mental derangement, or both, suffered and permitted Sly to rape the child to cure it of the mother's claim of masturbation, and that Sly, in doing so, not only wounded and tore its body, but communicated to it the loathsome disease of gonorrhea; that the accused, as county attorney, had knowledge of such facts when he suffered and permitted the parties to be charged with the misdemeanor of contributing to juvenile delinquency and in such proceeding called only the child as a witness and a doctor who had examined the child before the offense was committed and testified there was no evidence of violence, and, though requested by the juvenile officers who had investigated the case and knew the facts to call other witnesses, the accused refused to do so, by reason of which the jury found the parties not guilty; and when demand thereafter was made of the accused to further prosecute the parties on a felony charge the accused refused to do so upon the alleged ground that such acquittal was once in jeopardy; that, upon complaints having been made by divers persons to the district attorney because of the accused's failure to prosecute the parties on a felony charge, the district attorney instituted proceedings against them on such a charge, but the accused not only failed to give him any support, but did what he could to prevent a successful prosecution of the parties on such charge. We think the material parts of the charge are sustained by the evidence.

Another charge relates to this: It is charged that, while

the accused was county attorney and Higgins district attorney, there were a number of individuals, men and women, in Juab county, living in and teaching open adulterous relations; that the accused, as county attorney, accompanied by a justice of the peace and a stenographer, made an investigation of the facts and had the testimony of numerous witnesses taken and reduced to writing and a transcript made of the stenographer's notes on behalf of the county, but that the accused, as county attorney, refused to institute any proceedings against any of such parties; that upon a protest made by divers citizens to the district attorney he investigated the matter and inquired of the accused as to the facts, but the accused refused to disclose anything to the district attorney, or to give him a copy of the transcript of the stenographer's notes and warned the district attorney to keep his hands off of the matter; that the district attorney then obtained a copy of the transcript from the stenographer, and upon further investigation caused complaints to be filed against three of the parties charging them with the crime of adultery, and, over the objection and protest of the accused, caused them to be bound over to the district court; that the accused, as county attorney, refused to aid the district attorney in the prosecution of any of the cases and opposed the prosecution of them; that the district attorney convicted two of the parties so charged, but was unable to secure a conviction of the other party because of the opposition and interference on the part of the accused. Considerable evidence also was given respecting this charge. Without detailing it, let it suffice by saying that the charge in all of its essentials is maintained and supported by the evidence.

There are four of five other charges, some of them relating to conduct of the accused while judge and others while he was county attorney, and considerable evidence adduced respecting them. They are of less importance and gravity than those already considered, and, having found the accused guilty of the charges heretofore referred to, we deem it unnecessary to further consider such other charges or to

express any opinion concerning them, except the necessarily implied conclusion that we do not find them in and of themselves of sufficient importance or gravity to warrant disbarment.

We now approach the most difficult question in the case, the power of this court to deal with the matter, and if the power exists the kind of judgment, whether of disbarment or otherwise, that ought to be rendered. Two of the charges of which the accused is found guilty, the Schultz matter and the attempted suspension of Higgins and Foster, relate to conduct of the accused while he was judge of the district, and two of them to his conduct while he was county attorney and before he became judge. Because of our statute (Comp. Laws Utah 1917, § 1786) that a judge of the district court cannot act as an attorney or counsellor at law in the court of which he is a judge, or in any other court, and that the accused, so long as he is judge, is forbidden from practicing his profession as a lawyer, it is urged that the proceedings but seek to suspend or disbar him from doing what he is not doing or seeking to or attempting to do. It further is urged, because of the Constitution of our state (art. 6, § 19, and art. 8, § 11) that a district judge, among other officers, is liable to impeachment "for high crimes, misdemeanors or malfeasance in office," and "may be removed from office by the concurrent vote of both houses of the Legislature," etc.; that such provisions in case of transgressions of judicial officers should be regarded as exclusive; and that, in view of such provisions, this court is not possessed of power to disbar judges of the district court, and though it be held that it has such power, wisdom, and public policy, in view of the remedy provided for by impeachment, forbid its exercise in such a case, and especially where substantially the same charges as are here presented were presented to the Legislature and by the judicial committee of the House, on a hearing, rejected and dismissed. In support of these propositions counsel for the accused cite In re *Silkman,* 88 App. Div. 102, 84 N. Y. S. 1025; In re *Strahl,* 201 App. Div. 729,

195 N. Y. S. 385; *People ex. rel. Johnson* v. *Goddard,* 11 Colo. 259, 18 P. 338; *Baird* v. *Justice Court,* 11 Cal. App. 439, 105 P. 259; and *In re Dellenbaugh,* 9 Ohio C. D. 325.

The first three cited cases in the main support the contentions of the accused, not so much as to the proposition that the court is without power to discipline or disbar, but rather that wisdom and public policy forbid the exercise of the power in such a case as this. The last-cited case, In re Dellenbaugh, as we read it, makes against the accused as to all the propositions. Baird v. Justice Court does not seem to throw any light on the question under consideration. On the other hand, there is good authority to sustain the proposition that, if sufficient cause exists therefor, an attorney at law may be disciplined or disbarred and his license to practice law canceled and revoked, though he holds or occupies a judicial or other official position, or is not for other reasons at the time engaged in the practice, and though for the committed offense or offenses or wrongs he might also be subject to impeachment or indictment. *State* v. *Peck,* 88 Conn. 447, 91 A. 274, L. R. A. 1915A, 663, Ann. Cas. 1917B, 227; *In re Breen,* 30 Nev. 164, 93 P. 997, 17 L. R. A. (N. S.) 571; *State* v. *Martin,* 45 Wash. 76, 87 P. 1054; *In re Voss,* 11 N. D. 540, 90 N. W. 15; *In re Norris,* 60 Kan. 649, 57 P. 528; *In re Jones,* 70 Vt. 71, 39 A. 1087; *People* v. *Anglim,* 30 Colo. 40, 78 P. 687; *In re Hobbs,* 75 N. H. 285, 73 A. 303; *People* v. *Phipps,* 261 Ill. 576, 104 N. E. 144; *People* v. *Smith,* 290 Ill. 241, 124 N. E. 807, 9 A. L. R. 183, and notes; *In re Hopkins,* 54 Wash. 569, 103 P. 805; *In re Dellenbaugh,* 9 O. C. D. 325. Such we believe to be the weight of authority.

In *State* v. *Peck,* supra, the court said:

"The misconduct alleged, and made the basis of the judgment, was misconduct connected with the performance of his judicial office. The claim made upon demurrer to the complaint, and renewed at the hearing, that such misconduct was not misconduct as a member of the bar, and therefore not of a kind to justify discipline as such member, is for a double reason, wholly without foundation. In the first place, it did directly involve a misuse of the professional privilege. In the second, it disclosed a moral unfitness for the enjoyment of that privi-

lege, and it matters not whether the disclosure came through professional channels or not."

In *State* v. *Martin*, supra, it is said:

"All the acts specified in the findings above relate to appellant's conduct when assuming or seeking to act as an attorney, except those set forth in No. 11. Those occurred while he was judge of the superior court. It seems to have been conceded that appellant's acts as judge could not be examined in this proceeding, but the acts specified in the said finding not only reached to appellant's conduct as a judge, but they also involved him as a man. Such a conception of the moral responsibilities and proprieties, and such a manifestation attending the conduct of a lawyer when acting as judge, cannot well be divorced from the man himself when his character and acts as a lawyer are under investigation. We think the findings we have here considered are sufficient to sustain the judgment of suspension."

In *Re Dellenbaugh*, supra, the court said:

"But the main proposition in the case, which has been argued to a very great extent by the attorneys on both sides, is that Judge Dellenbaugh is acting now as judge on the common pleas bench, and that the statute forbids him to practice at his profession while he is thus acting on the common pleas bench. There is an exception to his being forbidden to practice, in that he can finish any work that he may have commenced in the federal courts, but that he cannot practice in the state courts; the statute prohibits that entirely. And it is claimed that he, not being a practicing attorney, being removed by force of that statute from being a practicing attorney while he is a judge, is not filling the office of an attorney during that time, and that being so, he cannot be proceeded against. And then it is urged also that the Constitution of the state provides a punishment, a sufficient punishment against one who is acting as judge, who, in any way, fails to perform the duties of that office faithfully or honestly, that he may be removed by impeachment; and that the court cannot proceed in these proceedings without infringing on the duties and rights of that body, that is, to try him by way of impeachment.

"Now, we have examined a great deal of authority upon these two questions, and there is not much that is fairly in point.

"We have examined a case in 6 Dowling Practice Cases, 310. In that case, an attorney undertook to entirely desert the profession of law and go into other business, and, when proceedings were commenced against him, he pleaded that as a defense he was no longer a lawyer; that he was no longer practicing the law; and that the court, therefore, had no jurisdiction to try him. But the court ruled in that case

that an admission to the practice of the law is one for life unless the attorney is sooner removed, and that, while he leaves the practice and goes into other business, he may at any time return to that business again; that is, to the practice of the law, and that his name and his right remains in the practice of the law, and that, although he has attempted to withdraw himself entirely from the profession and from the practice, yet the court has a right to deal with him as a member of the bar and to disbar him."

It may as well be said that we cannot deal with an attorney and counsellor at law as a member of the bar of this court, if holding a judicial or other public or official position, if the wrongs and conduct committed by him render him subject to indictment, or at least not until he is convicted, as to say that we may not deal with him for wrongs and conduct rendering him subject to impeachment, or at least not until he is removed from office. It is generally held that misconduct of an attorney, even though outside of his professional dealings as such, may be sufficient to justify his discipline or disbarment. 2 R. C. L. 1099. And this court is committed to the doctrine that an attorney, as a member of this court, may be disciplined and disbarred though the acts and conduct are not directly connected with his practice, if they show such a lack of honesty, integrity, and fidelity as to indicate that he is an unfit and improper person to be intrusted with the powers and duties of an attorney. *In re Platz*, 42 Utah, 439, 132 P. 390. This court is further committed to the doctrine that its power to deal with its own officers, including attorneys, is inherent, continuing, and plenary, and exists independently of statute, and ought to be assumed and exercised as the exigencies and necessities of the case require (*In re Evans*, 42 Utah, 282, 130 P. 217, and *In re Platz*, supra), and that courts, having power to admit attorneys to the bar, also possess, as a necessary and inherent incident of such power, the right to disbar them for unworthy behavior, unprofessional conduct, or mortal turpitude, or moral unfitness independently of authority given by statute. *In re Hilton*, 48 Utah, 172, 158 P. 691, Ann. Cas. 1918A, 271.

When we thus admit one as an attorney and counsellor at law and as a member of the bar of this court, and grant him a certificate or license and send him forth as qualified to practice law and as worthy of public trust and confidence, but find that by his acts and conduct he has shown himself unworthy and morally unfit longer to be intrusted with the duties and obligations as an attorney at law, and that he has forfeited his right and claim thereto, we, both under the statute (Comp. Laws Utah 1917, § 331) and under our inherent power, have authority, when the exigencies and necessities of the case require, to cancel and revoke his license and bar him from thereafter engaging in the practice of the law, though he, at the time, may hold a judicial or other official position. Of course, it goes without saying that in the exercise of such power the court in such case deals only with the status or relation of the attorney as such, and in no sense with respect to any other official position, whether judicial or otherwise, which may be held by him.

We thus are brought to a still further and more difficult question: What do the necessities and exigencies of the case here require? The most serious charge of which the accused is found guilty is the Schultz matter. We are not now concerned with questions of whether the restraining order was or was not properly granted, or whether the motion for a change of judge was properly or improperly overruled, or whether the restraining order was properly or erroneously modified, nor are we now concerned with any other ruling of the court in the case in the sense of determining whether the ruling was correct or incorrect. We are not now concerned with what the accused did on the bench and in the exercise of judicial functions, but what he did off the bench and not in the exercise of such functions. The writing of the letter and delivering it to Whitehead to get Schultz to sign it were acts not in any sense judicial or in the exercise of judicial functions. That such acts constituted misbehavior and were unwarranted and unjustifiable is clear enough. Had they been done merely because of ignorance, or of a

want of a proper appreciation of the duties and dignity of the position of the accused, either as a lawyer or as judge, or because the accused did not know better, or if but done foolishly with no bad or wrongful motive, they, perhaps, so far as striking him from the roll as an attorney and counsellor at law, might be overlooked. But it is hard to accept as true that one worthy of being a member of the bar of this court or of holding the judicial position held by him could believe that such conduct was proper or harmless or innocent or that it was warranted or justifiable. Had the accused not been a judge, and was merely an attorney at law, and in connection with a case in which he was interested had written and delivered a letter to another to get the opposing litigant to sign, with the motive and purpose as found the accused wrote and delivered the letter in question, to cause a litigant to discharge his counsel, deprive him of business before the court, induce the litigant to believe he had been deceived and misled by his counsel, to prevent a review of a ruling made by the court, and to injure and punish opposing counsel, there would not be much difficulty in reaching a conclusion that such conduct was unprofessional and unworthy that of a member of the bar. That the accused also was judge of the court, but aggravated the misbehavior and unworthy conduct which in effect amounted to moral turpitude or moral unfitness, something done knowingly, willfully, and contrary to justice, honesty, and good morals.

As to the Sly Case, the accused testified that he did not prosecute the parties because he did not believe them guilty; that in the adultery cases he believed the evidence was insufficient to secure a conviction. That the evidence and available facts known to the accused were ample to show the commission of the offenses charged, and reasonable cause to believe that the parties accused were guilty of them, and that the accused was derelict of duties in failing and refusing to prosecute such cases are all clearly shown. But such mere dereliction is not enough in pro-

ceedings of this kind to warrant discipline or disbarment. There also, in addition to such dereliction must be shown some unprofessional conduct, moral turpitude, moral unfitness, or corruption on the part of the accused. It is shown that he without just cause refused to prosecute the cases or to aid the district attorney in the prosecution of them. But why did the accused so refuse? That is the point. As already observed he testified that in the one case he did not believe the parties guilty, and in the other that the evidence was insufficient to justify a conviction. On the record, the accused's answer and his testimony in such respect are quite unsatisfactory. It, however, was shown that he had no acquaintance with or friendship for the accused parties, nor is it claimed, nor does the record show, that he in the course pursued by him was prompted or induced by any pecuniary consideration or by any attempted bribe or corruption of any sort, nor, originally at least, with any apparent desire to aid the accused parties or to uphold them in their charged criminal acts and conduct. To put the matter as favorably to the accused as the record admits, it may be said that the accused, unduly jealous of his office as county attorney, the duties and responsibilities of which were not fully comprehended or appreciated by him, resented and rebuked suggestions and requests of officers who had investigated the cases, and more severely resented and rebuked complaints made that the cases be investigated by the district attorney between whom and the accused strained relations existed, and in the interference by the district attorney, and from such motives, and that his own conduct in refusing to prosecute the cases might be vindicated, the accused refused to prosecute the cases or to aid in the prosecution of them, and even went out of his way to aid the parties charged with such offenses and to bring about their acquittals so as to bring discredit upon the district attorney because of his interference. The situation may not be put any milder, and perhaps ought not to be put any stronger. It is but an illustration often seen elsewhere where the administration of public af-

fairs and public good suffer through hostile, envious, and jealous officials having conflicting interests and vaunting ambitions. Though the conduct of the accused in respect of such cases cannot be condoned and deserve severe condemnation and rebuke, still, were there nothing else, we would feel hardly justified for that cause alone to visit on him the drastic punishment of disbarment.

That, to a large extent, is also true as to the charge relating to the suspension of Higgins and Foster. Again we are not now concerned with the question of whether the court had jurisdiction to suspend Higgins and Foster, or whether the right remedy or procedure was adopted or applied. In this proceeding we have attempted to and have divorced the exercise and performance of mere judicial functions of the accused, as the court or the judge thereof, from extraneous acts or conduct of the accused and have referred to the former only as they furnish a basis or circumstance or inducement of the latter. If the accused entered into a conspiracy with others to suspend Higgins, such an act of course was extraneous to his judicial functions and was wrongful and vile whether he was a judge or not; and because he was the judge through whose instrumentality the object of the conspiracy was to be accomplished all the more wrongful and base. From the evidence we find that a few ardent supporters of the accused and avowed enemies of Higgins advised, or at least aided and encouraged, the institution of the proceedings to suspend or disbar Higgins and Foster, but we do not find sufficient evidence to justify a finding that any conspiracy for such purpose was entered into. The institution of the proceedings grew out of the personal campaign as heretofore referred to, and that the good faith of them may well be questioned is clear enough; still sufficient doubt in our minds exists as to the question of moral turpitude in such respect to give the accused the benefit of it, and again to reach the conclusion that the conduct respecting such proceedings is not, in and of itself, sufficient to disbar the accused. However, when such other matters are viewed

and considered in connection with the Schultz matter, which we think shows moral turpitude and moral unfitness, we are of the opinion that, in view of them and of the whole record, it becomes our duty to pronounce some sort of judgment against the accused.

In making the foregoing statements and conclusions we have endeavored to fully and fairly reflect the record, in so far as it discloses the acts and conduct of Judge Burton. Owing to the great mass of the evidence, however, and in view that Judge Burton alone is on trial here, it is both unnecessary and impractical to fully state the facts respecting the conduct of Mr. Higgins and some others whose acts and conduct, it is claimed, to a greater or lesser extent may have provoked, or at least influenced, the acts and conduct of Judge Burton complained of in this proceeding. In the determination of the kind of judgment to be rendered, we shall therefore consider both the acts and conduct of others which to any extent may have provoked or influenced Judge Burton's acts and conduct, so far as the acts and conduct of others may be considered in mitigation or palliation of his acts and conduct.

In view of this record and what has been said, the question necessarily arises: What shall the judgment of this court be? We confess that the question has presented some difficulties. In seeking for an answer, however, we have felt constrained to keep in mind the following facts and circumstances: (1) That the acts and conduct of Judge Burton have been called to the attention of the House judiciary committee of the state Legislature and that that committee declined to take action against him as it was empowered to do; (2) that some of the acts and conduct of Judge Burton were undoubtedly provoked, or at least influenced, by the acts and conduct of others, and in some instances ill advised by ardent supporters with selfish motives, all of which should be considered in determining his guilt; (3) that Judge Burton has passed through a most trying ordeal in the past year,

which, no doubt, will have a salutary influence upon his future conduct; (4) that he now holds a very important position, to which he has been elected by the people of his district after some of the acts and conduct complained of had taken place; (5) that by virtue of the statute he is already prevented from practicing his profession as a lawyer while he holds the position of judge, and hence a mere suspension would be useless; (6) that to disbar him would not remove him from the office of judge, but would at most suspend him from practice, from which, as just stated, he is already suspended during the term for which he is elected; (7) that his acts and conduct, while wholly unjustifiable and reprehensible, are, nevertheless, not of that vicious nature which necessarily call for the drastic punishment of permanent disbarment; finally, that, in view of the necessarily detrimental effect that a disbarment would have upon the public interests, a judgment of disbarment should be rendered in a case like this only when there is no other alternative.

In view of the foregoing we have deemed it more in consonance with justice and utility to apply a milder penalty than that of disbarment. This conclusion is amply sustained by authority. Referring to this subject, the author, in volume 2 of his excellent work entitled "Thornton on Attorneys at Law," at page 1319, says:

"Although the statutes generally prescribe disbarment or suspension, in the alternative, as a penalty for professional misconduct, in the absence of express restriction these statutes do not limit the inherent common-law power of the courts, which may be exercised to inflict a less severe punishment for conduct which, under the circumstances disclosed, is not grave enough to warrant the penalty of suspension or disbarment. In such cases, therefore, the attorney may be reprimanded from the bench in open court, or may be censured in the court's written opinion, which will be published in the official reports, or the proceedings may be dismissed with a mere expression of the court's disapproval of the attorney's conduct."

While this court deeply deplores and disapproves of Judge Burton's acts and conduct complained of in this proceeding,

In re Burton, 67 Utah 118.

and especially respecting his conduct in writing the letter in the Schultz Case, we, nevertheless, are not unmindful of the matters that should be considered in mitigation or paliation.

The judgment of this court, therefore, is that Judge Burton be, and he hereby is, rebuked and censured, and his acts as hereinbefore outlined are disapproved and condemned. Further, that he hereby is admonished that in discharging the important duties of his office he should ever be mindful of the rights and privileges of others, and especially those who, as ministers of the law, are called to practice in his court and to assist him in administering the law to the end that justice shall prevail; that it is his duty at all times to patiently hear those who by law are entitled to be heard in his court, and in case an attorney violates the law or the rules of court, or in case his acts and conduct are contumacious or contemptuous, to punish him as provided by law and in accordance with the recognized rules of procedure; that he must ever keep in mind that an attorney at law is the mere representative of the citizen whose only lawful means of vindicating his rights is to have recourse to a court of justice, and, in doing so, to call to his aid one who is learned in the law and versed in the procedure governing courts; that to suspend attorneys without a hearing or to assail them out of court or their reputations, as disclosed by this record, smacks too much of despotism to be tolerated in this country, which is governed by law and not by men.

It is so ordered.

In conclusion we desire to express our thanks and appreciation and to commend the members of the bar who took part in presenting the evidence to the referee, and who prepared and presented the case in this court for the able and conscientious manner in which the case was argued and presented. We also desire to extend our thanks to Hon. Elias Hansen, Judge of the Fourth judicial district for the able manner in which he conducted the proceedings as referee.