*This opinion is subject to revision before final
publication in the Pacific Reporter*

**2017 UT 50**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

SUSAN ROSE,
*Appellant,*

*v.*

OFFICE OF PROFESSIONAL CONDUCT,
*Appellee.*

No. 20151037
Filed August 15, 2017

On Direct Appeal

Third District, Salt Lake
The Honorable Royal I. Hansen
No. 070917445

Attorneys:

Susan Rose, pro se, Sandy, for appellant

Adam C. Bevis, Billy Walker, Salt Lake City, for appellee

JUSTICE PEARCE authored the opinion of the Court, in which
CHIEF JUSTICE DURRANT, ASSOCIATE CHIEF JUSTICE LEE,
JUSTICE DURHAM, and JUDGE POHLMAN joined.

Having been recused, JUSTICE HIMONAS does not participate herein;
COURT OF APPEALS JUDGE JILL N. POHLMAN sat.

JUSTICE PEARCE, opinion of the Court:

## INTRODUCTION

¶1 The district court disbarred Susan Rose for violations of
Utah's Rules of Professional Conduct in cases Rose handled in both
federal and state courts. Her disbarment came after the district court
struck her answer and entered default judgment against her. The
disbarment did not come suddenly, or by surprise. Over the course
of several years, Rose had received multiple warnings from multiple
tribunals. These tribunals called her motion practice "bizarre,"

"inscrutable," "dilatory," "frivolous," "legally meritless," "wholly superfluous," "utter[ly] incomprehensibl[e]," "unresponsive, immaterial, and redundant," and "not based in reality."

¶2  After receiving and investigating referrals concerning Rose's conduct, the Office of Professional Conduct brought an action in the Third District Court. Nearly eight years later, the district court struck Rose's answer and entered default judgment, concluding that Rose had abused the discovery and litigation process. By entering default judgment, the court accepted as true the allegations that Rose had violated a number of the Rules of Professional Conduct.

¶3  At her subsequent sanctions hearing, Rose refused to defend herself. She told the district court, "I think it's fair to say I know how this will go, I know how the end result will be, and I'm done." And in the end, Rose was disbarred.

¶4  Rose does not explicitly argue on appeal that the district court should not have entered default judgment, that her conduct did not violate the rules, or that disbarment was too harsh a sanction.[1] Instead, she claims that Utah's process is unconstitutional in a number of ways. She contests this court's jurisdiction and argues that the Supremacy Clause and principles of *res judicata* prevent Utah from disciplining her. She also brings a number of constitutional claims, arguing that Utah's attorney discipline proceedings violated her due process and equal protection rights under the United States Constitution. She ultimately petitions this court to dismiss this case entirely because "Utah's system is an inquisition" that violates her due process and equal protection rights and is therefore "void."

¶5  We affirm the order of the district court but note that this is an unusual case. The district court entered a default judgment against Rose, and Rose chose not to defend herself at the sanctions hearing. Rose has not directly challenged the decision to enter

---

[1] There can be no doubt that Rose believes that the district court should not have entered default, that she did not violate the rules of professional conduct, and that disbarment was not an appropriate sanction. But Rose does not aim fire directly at those contentions, preferring instead to attack this court's jurisdiction and to assert that Utah's attorney discipline process is unconstitutional.

default or the appropriateness of disbarment as a sanction. This requires us to start from the factual premise that Rose committed the violations of which she was accused. We are only left to sort through Rose's challenges to the attorney discipline system.

## BACKGROUND

¶6 Susan Rose was admitted to the Utah State Bar in 1997. In 2001 and 2005, the Utah Bar received two informal complaints against Rose in two separate cases—one in federal court and the other in state court.

### I. The Federal Court Case

¶7 In 1999, Rose represented a group of plaintiffs in an action before the Navajo Tribal Court. The Tribal Court granted Rose's clients relief. Rose later tried to enforce the Tribal Court's order against San Juan County and several non-tribal member defendants in federal district court. Her case was assigned to Judge Dale Kimball.

¶8 While representing her clients in federal court, Rose filed several pleadings and motions that the court found to be frivolous. After Judge Kimball granted a motion to dismiss against certain defendants based on sovereign immunity and then dismissed the case as to several other defendants for lack of jurisdiction, Rose filed a notice of appeal in the Tenth Circuit Court of Appeals. She also moved to disqualify Judge Kimball.

¶9 In Rose's motion to disqualify Judge Kimball, Rose emphasized Judge Kimball's apparent religious affiliation. Rose complained that "being a member of said Church and an acknowledged social leader in Utah, [if he] would have ruled to enforce the civil rights of the Navajo Court plaintiffs, Judge Kimball may have been subjected to great social and political pressures." Rose claimed that ruling in her clients' favor would have caused Judge Kimball "political and social embarrassment."

¶10 The judge did not agree, and he told her so. He explained that Rose and her clients would "not find a judge *more* sympathetic to their claims, *more* willing to apply the law impartially, or *more* patient with [Rose's] blundering-but-probably-well-meaning efforts." (Emphases in original.) Judge Kimball nevertheless recused himself because he believed that her clients "ha[d] lost faith in th[e] court's ability to treat them impartially."

¶11   Judge Kimball's opinion and recusal order describe Rose's conduct before his court and her competence as an attorney:

- The court had been "tolerating [Rose's] repeated and time-consuming calls to chambers with procedural questions and also tolerating Plaintiffs' often incomprehensible pleadings and memoranda."

- "Defendants have repeatedly—'and justifiably'—requested . . . that the court dismiss Plaintiffs' Complaint based on . . . its utter incomprehensibility and its failure to identify which claims are alleged against which Defendants. This court, however, . . . has chosen . . . to endure Plaintiffs' inscrutable Complaint."

- "Plaintiffs [filed a] constant stream of motions, corrections to motions, amendments to motions, re-filing of motions after the responsive memorandum had been filed by the Defendants, and further briefing of motions after oral arguments."

- "[T]he court has clearly demonstrated its frustrations with Plaintiffs and their counsel for their failure to understand the law or to follow the Federal Rules of Civil Procedure, the local rules, and the Rules of Professional Conduct."

- "Plaintiffs also cast various aspersions regarding this court's alleged statements during oral arguments, without any citations to transcripts to demonstrate that such statements were actually made and the context in which they are made. To the extent that there exists any kernel of truth in any of the various statements that Plaintiffs allege that the court made, the statements, not surprisingly, have been taken entirely out of context and/or mischaracterized . . . ."

- "[I]t was apparent in various memoranda and oral arguments throughout this litigation that Plaintiffs and their counsel do not appear to understand the concepts of [the prior] Orders or the reach of the Orders, as they have repeatedly mischaracterized

and/or misrepresented various statements in the Order."

- "Only in this case would one find (1) Plaintiffs' counsel attempting to represent a Defendant in the same case; (2) a Defendant who opposes his dismissal from the case; and (3) Plaintiffs claiming that the court's bias against *Plaintiffs* is reflected in the court's purported interference with a *Defendant's* filing of a responsive pleading."

(Emphases in original.) Judge Kimball remarked that, in short, it was "clear that [Rose's] perception is not based in reality."

¶12 The case was reassigned to Judge Bruce Jenkins. Judge Jenkins dismissed several claims against the remaining defendants. Rose in turn filed motion after motion, amendments to motions, objections to rulings, and motions for reconsideration. Judge Jenkins ultimately dismissed all claims against the remaining defendants for a lack of any factual basis for any claim.

¶13 Over the next three years, Rose continued to deluge the court with her motion practice. Finally, in 2005, Judge Jenkins issued a 172-page memorandum decision clarifying his 2002 pretrial hearing ruling.

¶14 Judge Jenkins's order also commented on Rose's conduct before his court and her competence as an attorney:

- "[G]leaning the elements of a particular antitrust law violation from the dense thicket of the plaintiffs' pleadings, original and amended, proves a daunting and largely fruitless task."

- "[I]t becomes apparent that many of plaintiffs' theories of liability had already failed as a matter of law—one because the statute in question simply does not afford Plaintiffs a private civil remedy, the others because they are legally meritless."

- "[Plaintiffs'] claims may properly be dismissed as frivolous . . . because they are based upon an indisputably meritless legal theory, or are footed upon conclusory assertions rather than specific facts."

- "From the commencement of this litigation, plaintiffs' counsel has taken a dramatically different approach to pleading . . . claims, at times shuffling each plaintiff's factual allegations and legal assertions together as one would a deck of playing cards, sacrificing narrative sequence in favor of argumentative characterizations and conclusory assertions."

¶15 Even after the district court had entered its final judgment and exhaustively explained the basis for its decision, Rose continued to file motions in the federal district court. She also filed a pleading in the Tenth Circuit asking it to recuse Judge Jenkins. Judge Jenkins responded to Rose in an order stating that the motions before him were "wholly superfluous." Judge Jenkins pronounced "enough is enough" and refused to entertain any further motions in the case until the Tenth Circuit had decided Rose's motion to recuse.

¶16 At various points before that, Rose had moved the federal district court to recuse Judge Jenkins. Judge Jenkins denied each of Rose's five motions to recuse him. He denied her motions "for lack of the requisite factual grounds that would cause an objective observer reasonably to question the court's impartiality." He reminded Rose that each of her clients' claims had been dismissed years earlier as "frivolous." He further mused that "[t]he underlying purpose of the plaintiffs' recusal motions may be discerned in the particular relief . . . sought: disqualification of the *entire bench* of the District Court of Utah" for a judge with a "more favorable view of the Plaintiffs' theories of jurisdiction and liability." (Emphasis in original.)

¶17 Rose appealed Judge Jenkins's decision to the Tenth Circuit, and Judge Jenkins issued another order that "no further motions may be filed in this case" pending a mandate from the Tenth Circuit. The Tenth Circuit dismissed Rose's appeal as "frivolous." But Rose continued to file motions. In 2007, Judge Jenkins issued an opinion stating, "[a]t some point, litigation must come to an end, and judgments must become final. For plaintiffs . . . , this case has indisputably reached that point."

## II. The State Court Case

¶18   Rose represented a mother in Utah State Court after the mother's child's grandparents filed a petition for visitation. The case was assigned to Seventh District Court Judge Lyle R. Anderson.

¶19   Rose questioned whether the Navajo Nation Tribunal or the Utah State Court had jurisdiction to hear the case and eventually moved to stay the State Court proceedings. Judge Anderson set a hearing on Rose's motion to stay for February 2005. On the morning of the hearing, Rose claimed she could not attend the hearing because a Navajo Tribal Court Order provided that anyone appearing in the State Court action would be subject to confinement for a year or a $5,000 fine. She also objected to all proceedings in the case until the issue of jurisdiction could be determined. Even so, Judge Anderson heard testimony from the witnesses who had appeared that day and issued an order two days later.

¶20   Like Judge Kimball and Judge Jenkins, Judge Anderson commented on Rose's conduct before the court and her competence as an attorney:

> As an initial matter, the court notes that the quality of the pleadings filed in the case on behalf of the Mother suggest that [Rose] is only marginally competent, if that, to practice law in Utah. The clerk is directed to make copies of all pleadings filed by counsel in this case and submit them with a copy of this order to the Office of Disciplinary Counsel of the State of Utah.

¶21   Judge Anderson explained that Rose's claim that she was forbidden to appear in the State Court action was "entirely self imposed" because *her* client sought and obtained the order forbidding appearances in the State Case. He set another hearing in the case. On the date of that hearing, Rose filed a motion to disqualify Judge Anderson. Judge Anderson referred the motion to Judge Scott Johansen for review. A few days later, Judge Johansen issued an order:

- Rose's motion to disqualify Judge Anderson was untimely except as to "an undated threat to refer Judge Anderson to the 'Judicial Misconduct Committee.'"

- Rose's allegations against Judge Anderson "fell woefully short of the standard."

- "The interjection of these other issues is so bizarre as to raise serious questions of compliance with Rule 11 URCP . . . . [R]espondent's counsel is directed to appear and show cause why the inclusion of the requests and issues wholly irrelevant to a Rule 63 Motion, failure to sign the affidavit, filing an untimely motion, objecting to a reviewing judge who is clearly authorized by the rule, and alleging facts well below the legal standard for disqualification, do not constitute a violation of Rule 11."

¶22   Rose objected to the proceedings, and the court sanctioned her. It ordered Rose to pay attorney fees and submit a report regarding the standard for judicial disqualification.[2] Rose then filed a suit against the grandparents in federal court, which was dismissed for lack of jurisdiction. After that case was dismissed, Rose attempted to appeal to the Tenth Circuit, and that appeal was also dismissed for lack of jurisdiction. Rose also filed a writ of certiorari before this court in 2005. Grandparents eventually dismissed their claims.

### III. OPC's Prosecution

¶23   In the midst of the aforementioned litigation, the Utah Bar received an informal bar complaint against Rose for her conduct in the Federal Case and another for her conduct in the State Case.[3] In February 2004, the Office of Professional Conduct (OPC) served a Notice of Informal Complaint on Rose for allegations arising from the Federal Case, and in June 2005 it served a similar notice for allegations arising from the State Case. Immediately after receiving the first notice, Rose asked to postpone the investigation to accommodate concerns about her health. Both cases were delayed until 2007.

¶24   In September 2007, a three-member screening panel of the Utah Supreme Court's Ethics and Discipline Committee heard both

---

[2] As of the date of OPC's screening panel on this case, Rose still had not complied with the sanctions order.

[3] It is not apparent from the record who referred Rose's conduct in the Federal Case to OPC.

cases. The panel decided probable cause existed that Rose had violated the Utah Rules of Professional Conduct and recommended that a formal complaint be filed. In December 2007, OPC filed a Complaint in district court alleging twelve violations of seven rules.[4] The case was assigned to Judge Robert Faust in the Third District Court.

¶25 To illustrate how the case proceeded, OPC's Complaint against Rose comprises pages 1–25 in a 28,000+ page appellate record; Rose's answer does not appear until page 2,507. Her answer was filed more than a year after OPC filed the Complaint. In the interim, Rose moved for various extensions of time, for a more definite statement, for dismissal, for change of venue, to file an over-length brief, to stay proceedings, to strike various portions of the Complaint before responding, to strike the Complaint itself, and to disqualify Judge Faust—among other things.

¶26 Rose filed many of these motions in lieu of answering despite court orders fixing a deadline for Rose to answer the Complaint. For example, the court ordered Rose to answer the Complaint within ten days on May 21, 2008. When Rose failed to comply, on July 29 the court cautioned Rose that if she did not answer OPC's Complaint, "default could be entered." On August 14, the court again ordered Rose to answer within ten days or suffer entry of default judgment. The court repeated its order on September 19, giving Rose until September 29 to answer. Rose filed a motion to disqualify Judge Faust, who recused himself so as to not cause further delay.

¶27 The case was reassigned to Judge Vernice Trease. At a hearing before Judge Trease on December 4, the court ordered Rose to respond to the Complaint by January 26, 2009. Rose failed to appear at a hearing in the matter on January 16. She also failed to meet the court's January 26 deadline. On January 27, OPC filed a motion for entry of default judgment citing Rose's refusal to obey court orders and respond to the Complaint.

---

[4] Rule 1.1 Competence; Rule 1.7 Conflict of Interest with Current Clients; Rule 3.1 Meritorious Claims and Contentions; Rule 3.2 Expediting Litigation; Rule 4.2(a) Communicating with Persons Represented by Counsel; Rule 8.2 Judicial Officials; and Rule 8.4 (a), (d) Misconduct.

¶28 In February, Rose submitted a document titled "Respondent's Forced Answer as Ordered by the District Court . . . Issued from the Bench as Outside the Court's Jurisdiction to Order." In her "Forced Answer," Rose refused to recognize the court's jurisdiction over her attorney discipline case. She called the entire case "*void ab initio*," argued that answering the Complaint would immediately harm her clients, and claimed that the court's order requiring her to answer the Complaint "constitutes duress."

¶29 Rose's motion practice continued. Over the next year, she moved for extensions of time, to stay the proceedings, and to strike various parts of the Complaint. Rose eventually filed a document titled "Compliance with the Court's January 29 and February 2 Orders." There she claimed OPC's action against her was unconstitutional. Rose invoked her Fifth Amendment right against self-incrimination and claimed she did not have to produce documents in discovery because they were "irrelevant and production does not apply." She repeated the following answer verbatim in response to almost all of OPC's requests for admission:

> This attorney lacks the resources and time and money to go through the [requested] document page by page and word by word to ascertain if this document is true and correct as a copy, therefore this attorney does not know if it is, and *therefore denies*.

> Certified copies of all orders are available to the Bar from the 7th District Court, and federal court sources. This admission has nothing to do with the category of charges in the Bar complaint, and is irrelevant to this prosecution. If the Bar wishes to show the relevance to the charges in the Bar's complaint, this attorney may wish to supplement this answer.

> I also state that I fear anything I say, as to this admission request will be used against me to also be used to subject me to an unknown punitive or criminal prosecution, of an unspecified nature, and therefore I claim my 5th [sic] United States Constitution's 5th Amendment protection against self incrimination, to remain silent as to this admission.

(Emphasis in original).

¶30 Rose also refused to respond to OPC's interrogatories asking her to identify any lay or expert witnesses she intended to call, to describe any mitigating circumstances she believed existed, to disclose her fee arrangements with plaintiffs in the underlying cases, or to describe interactions with her clients. Rose responded by claiming that most of the interrogatories OPC propounded were "irrelevant, immaterial" or called for privileged attorney work product. She also attempted to invoke her Fifth Amendment right to remain silent for fear of future "punitive or criminal prosecution, of an unspecified nature."

¶31 And in response to OPC's requests for production of documents, Rose again continued her practice of pleading the fifth and claiming that OPC's requests were irrelevant.

¶32 OPC moved the district court to strike Rose's answer and enter default judgment. OPC reasoned, "it appears that Ms. Rose will continue to delay and obstruct this case going to trial on the merits." It claimed, "Rose has asserted privileges that do not apply and made arguments upon which this Court has already ruled." OPC argued that under Utah Rule of Civil Procedure 37(b)(2)(C),[5] the court should strike Rose's answer as a sanction for frustrating the judicial process, because "failure to respond to discovery impedes trial on the merits and makes it impossible to ascertain whether the allegations of the answer have any factual merit." At a hearing on OPC's motion, Rose told the court, "I do not believe . . . I have been incompetent, immoral, fraudulent or in any other respect deleterious in my representation. . . . I've given my very best. And if I had to do it all over again, despite the Bar's prosecution, I would do it. I would do it again."

¶33 In July 2010, the district court granted OPC's motion to strike Rose's answer and entered default judgment. Judge Trease's order echoed the observations Judges Kimball, Jenkins, Anderson, and Johansen had made about Rose's practice style:

---

[5] The current rule permits the district court to "dismiss all or part of the action, strike all or part of the pleadings, or render judgment by default on all or part of the action" under subsection (b)(4), not (b)(2)(C), of Utah Rule of Civil Procedure 37.

- "Generally, throughout the proceedings in this court, Respondent's motions have been repetitive and often barely comprehensible as to the court rules and law on which she relies. Respondent's persistent submissions have unnecessarily stalled the proceedings since December 12, 2007."

- "Respondent has filed numerous motions to dismiss for lack of subject matter jurisdiction. . . . Each time, the court ruled that it had jurisdiction; each time none of the facts or circumstances changed. Respondent continues to fail to understand that OPC may bring an action in this court for Respondent's conduct in a federal district court matter."

- "The court has accommodated Respondent throughout the duration of these proceedings. It has granted Respondent numerous extensions to file her Answer. Respondent has filed countless motions to stay, motions for summary judgment, and motions to dismiss over the past two years, most of which are redundant, repetitive and frankly can be viewed as nothing less than attempts to stall the progression of this case and frustrate the judicial process."

- "After her first failure to respond, Respondent should have understood the court's order to compel. Nonetheless, Respondent's February 12 response is the same in that it is unresponsive, immaterial, and redundant."

- "OPC is unable to move forward without the evidentiary basis of Respondent's denials from her Answer. In presenting the same arguments she knows the court has already rejected, it is hard to view Respondent's conduct as anything but persistent dilatory tactics."

- "Based on the Respondent's conduct in this matter, this case cannot proceed to trial on the merits."

- "The court finds on the part of the Respondent willfulness, bad faith, and persistent dilatory tactics

in her continuing failure to comply with the court's order and for her failure to provide sufficient discovery responses. . . . The court sanctions Respondent under rule 37(b)(2)(C) by striking Respondent's Answer and declaring a default judgment."

### IV. The Long and Winding Road to a Sanctions Hearing

¶34 Rose continued to file motion after motion, delaying the second half of the attorney discipline process—the sanctions hearing. A sanctions hearing was finally scheduled for February 2012—about four years after OPC had filed its initial Complaint. Rose, however, failed to appear. Instead, she filed an "Emergency Motion to Reschedule Sanctions Hearing," because her father was dying and she felt "mentally and emotionally absolutely incapable of functioning for the hearing." Based upon the language in her request, OPC's 2009 motion to put Rose on disability status, and "another incident . . . less than a year ago, when Ms. Rose was hospitalized," Judge Trease placed Rose's bar membership on disability status and ordered that the sanctions hearing be rescheduled to a later date. Judge Trease reasoned that this course of action was warranted because Rose's language suggested she was incapable of defending herself. Rose was taken off disability status the next year at her request.

¶35 In 2013, the second phase of the attorney discipline process commenced and the case was transferred to Judge Constandinos Himonas.[6] Rose immediately began moving the court to dismiss for lack of due process, to set aside the default judgment, to dismiss for forum non conveniens, for a restraining order against all OPC prosecutions of anyone practicing in federal court, for sanctions against OPC, and for a permanent injunction, among others.

¶36 A sanctions hearing was scheduled for March 12 and 13, 2014. On the first day of the hearing, Rose moved to disqualify both opposing counsel and Judge Himonas. Judge Paul Parker considered Rose's Rule 63 motion to disqualify Judge Himonas. Judge Parker

---

[6] Because of his involvement with this case while serving on the district court, Justice Himonas does not participate in this matter.

denied Rose's motion because she argued that Judge Himonas was "legally incorrect in his decisions concerning jurisdiction, evidence[,] and other matters" and not, as the rule requires, that he was biased, prejudiced, or conflicted in any way. The sanctions hearing proceeded and lasted two days. The hearing was continued until April 7 after a delay to determine the outcome of Rose's motion to disqualify. The court heard evidence and continued the hearing to April 10.

¶37 On April 10, Rose appeared with counsel and filed an "Emergency Motion to Suspend Sanction Hearing." She presented the court with a novel though unavailing argument: that Judge Trease's entry of default judgment was only "implied" and, therefore, the sanctions hearing was both premature and a violation of her due process rights. Through counsel, Rose argued:

> Since the Court has apparently never indicated that it has actually determined . . . that Ms. Rose has actually violated any of the provisions of the Code of Professional Conduct, it does not appear that the Court even in its own mind has found her guilty of anything yet.

Judge Himonas refused to grant Rose's "Emergency Motion" for an indefinite suspension of the proceedings; instead, "out of an abundance of caution," he continued the hearing "to allow briefing on the[] legal issues" Rose presented. He warned that the scope of the briefing should be confined to issues that had not already been addressed: "[T]here is no opening here for issues that have been raised and rejected." A hearing on Rose's motion was scheduled to take place June 18. But Rose's counsel filed a number of requests for extension, and Rose also filed a number of other motions.

¶38 The court heard argument in December 2014, and issued a Memorandum Decision in February 2015. In his decision, Judge Himonas explained that the court had subject matter jurisdiction over the attorney discipline proceedings. After Judge Himonas was confirmed a member of this court, the case was transferred to Judge Royal Hansen.

¶39 In response to Judge Himonas's memorandum decision, OPC moved to reset the sanctions hearing. It argued

> [t]he Sanctions Hearing . . . was continued mid-hearing when Ms. Rose filed an 'emergency' motion to

dismiss. . . . There is nothing pending before the Court on an emergency basis and the matter should be immediately reset to conclude the Sanctions Hearing so that the parties and the Court are not prejudiced by further delay in the case.

¶40 Rose opposed OPC's request, rearguing—this time to Judge Hansen—that no default entry had ever been entered. She further moved to dismiss the matter. Judge Hansen denied these motions and scheduled a two-day sanctions hearing for August 17 and 18, 2015, giving "each party six hours to present their case."

## V. The Sanctions Hearing

¶41 On the morning of the first day of trial, Rose entered her appearance, then told Judge Hansen:

I feel like there have been enough due process issues, equal protection issues, violation of uniform operation of laws, open court provisions, on and on and on. And then the particular problems with entering the default, plus the fact that the default memorandum stated a certain relief and the proposed order tried to go beyond that . . . and so . . . I've reached the end of my road. . . . because I don't know how to say I mitigate these charges, because, unbelievably, I still do not understand those charges. I deny them—and—but I cannot prove my innocence. I don't know how to prove innocence. . . . And—and we haven't had a trial on the default judgment first. But it's a technical issue, . . . and I think what I'm going to do right now is—it took seven—seven and a half years to get some very fine explanatory orders from the Court, explaining to me . . . why and where and what for. But at this point, I believe any defense I might try to raise would be futile. And if I'm—if I'm not admitting to a claim, I don't know how to say—unmitigate it, you know? I—I don't know how that works. . . . I'm just taking a default on it. . . . So I'll leave here. . . . My defenses are with the appellate court. . . . I think it's fair to say I know how this will go, I know how the end result will be, and I'm done.

Rose then left the hearing and did not return.

15

¶42   In November, Judge Hansen issued his findings of fact, conclusions of law, and order disbarring Rose. He explained that Rose chose to leave after he invited her to stay multiple times and "indicated that if she chose to leave, the hearing would go forward without her participation." He also explained that "[a]s a result of the Default, the Court must accept all of the allegations in the Complaint as true," while also noting, "however, that evidence in support of these allegations was presented at the Sanctions Hearing."

¶43   Although unnecessary because of the earlier default judgment, Judge Hansen concluded that Rose had violated the following Rules of Professional Conduct: Rule 1.1 Competence; Rule 1.7 Conflict of Interest with Current Clients; Rule 3.1 Meritorious Claims and Contentions; Rule 3.2 Expediting Litigation; Rule 4.2(a) Communicating with Persons Represented by Counsel; Rule 8.2 Judicial Officials; and Rule 8.4 Misconduct. Judge Hansen also drafted an order that recited the evidence presented that demonstrated Rose had violated the Rules of Professional Conduct.

¶44   For example, Judge Hansen concluded that Rose had violated rule 1.1, competence—mandating that "[a] lawyer shall provide competent representation to a client," Utah R. Prof'l Conduct 1.1—in the Federal Case when she "filed numerous pleadings and claims . . . that were not supported by the facts or law, and which contained inaccurate information." She violated the same rule in the State Case when she "filed numerous pleadings which were only marginally competent; failed to comply with the Rules of Civil Procedure; and failed to apply the appropriate law to the facts in her case."

¶45   The court held that Rose violated rule 1.7, conflicts of interest with current clients—mandating that "a lawyer shall not represent a client if the representation involves a concurrent conflict of interest," *id.* 1.7(a),—in the Federal Case when she "communicated with and attempted to represent a Defendant in the litigation whose interests were directly adverse to those of [her] clients, the Plaintiffs."

¶46   Judge Hansen also concluded that Rose had violated rule 3.1, meritorious claims and contentions—mandating that "[a] lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis in law and fact for doing so that is not frivolous, which includes a good-faith argument for an

extension, modification or reversal of existing law." *Id.* 3.1. Rose violated this rule in the Federal Case when she "filed numerous claims, pleadings and appeals that were not supported by the facts and law, and which were not supported by a good faith argument to extend, modify or reverse the existing laws." She violated the same rule in the State Case when she "filed numerous claims, pleadings and appeals that were not supported by the facts and law, and nor did the filings contain any good faith arguments for any changes to existing law."

¶47 Judge Hansen further determined that Rose had violated rule 3.2, expediting litigation—mandating that "[a] lawyer shall make reasonable efforts to expedite litigation consistent with the interests of the client." *Id.* 3.2. She violated this rule in the Federal Case when she "filed a constant stream of motions, corrections to motions, amendments to motions, filed corrected or amended motions after the opposing parties had filed their response, filed lawsuits on other courts, and filed appeals which had no basis." She had also "failed to understand the law or follow the Rules of Civil Procedure, the local rules, and the Rules of Professional Conduct." Judge Hansen determined that "[t]hese unnecessary filings and actions served only to delay the proceedings." Rose violated the same rule in the State Case for the same reasons.

¶48 Rose had further violated rule 4.2(a), communication with persons represented by counsel—mandating that "a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer." *Id.* 4.2(a). Judge Hansen determined that Rose had violated this rule in the Federal Case when she "communicated with a represented person who she named as a Defendant in the same case, and knew to be represented by counsel."

¶49 Judge Hansen next concluded that Rose had violated rule 8.2, judicial officials—mandating that "[a] lawyer shall not make a public statement that the lawyer knows to be false or with reckless disregard as to its truth or falsity concerning the qualifications or integrity of a judge." *Id.* 8.2(a). Rose violated this law in the Federal Case when she filed "a motion to recuse a judicial official and in the memoranda supporting the motion, . . . made disparaging remarks about the judge's integrity and qualifications with reckless disregard as to the truth or falsity of those statements."

¶50   Rose had also violated rule 8.4(d)—providing that it is misconduct for a lawyer to "engage in conduct that is prejudicial to the administration of justice," *id.* 8.4(d)—in the Federal Case when she "filed numerous frivolous pleadings and claims" and "continued to file frivolous pleadings even after being warned and sanctioned. . . . caus[ing] significant delays and expense." And Rose violated the same rule in the State Case for the same reasons as in the Federal Case.

¶51   Judge Hansen finally determined that Rose had violated Rule 8.4(a)—providing that it is misconduct for a lawyer to "violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another," *id.* 8.4(a)—in both the Federal Case and the State Case "[a]s described herein."[7]

## VI. Choosing the Appropriate Sanction

¶52   In determining the appropriate sanction for Rose's violations in the Federal Case and in the State Case, the court considered a number of factors: (1) the duties Rose violated; (2) her mental state; (3) the potential or actual injury caused by her misconduct; and (4) aggravating or mitigating factors.

¶53   The court found that Rose violated duties she owed to her clients "by continuing to pursue matters that had no hope for a positive outcome and by failing to give her clients an honest interpretation of the facts and law." She breached her duties to

---

[7] We have expressed that "we are troubled by the practice of sanctioning attorneys for violating rule 8.4(a) based solely on their violations of other rules" because "it seems that the rule amounts to no more than a 'piling on.'" *In re Discipline of Brussow,* 2012 UT 53, ¶ 1 n.1, 286 P.3d 1246. And as note 1a of this rule explains, "A violation of paragraph (a) based solely on the lawyer's violation of another Rule of Professional Conduct shall not be charged as a separate violation." But as we explain above, Rose does not expressly challenge the district court's conclusion nor the proportionality of the sanction she received. Because we do not believe that the rule 8.4(a) violation was material to the district court's decision to disbar Rose, we raise the issue only to emphasize our continued discomfort with this application of the rule.

opposing counsel "by consistently misstating the facts and filing frivolous motions that only served to delay the inevitable outcome of the cases." She also breached her duties to the legal system "by not complying with Court orders" or "respecting the Courts when they rule against her, and by filing numerous motions to disqualify based solely on the fact that the Courts did not agree with her position." Finally, Rose breached her duties to the public "by her flagrant disregard for the legal process" and the "relentless pursuit of her own agenda without regard for court rulings and without respect for the other side, weak[ening] the public trust of attorneys and in the judicial system." The court found that Rose had "knowingly and intentionally" violated these rules.

¶54  The district court also found that her conduct had caused "real or potential injury" to the parties in the underlying cases and to the legal system. The "immeasurable waste of resources" that multiple court systems and their staffs and opposing counsel and their staffs spent dealing with her "constant barrage of motions and cases" directly injured those parties. The district court opined that Rose's conduct poorly reflected on the "public's perception of how attorneys should behave." And her "unfounded disparaging remarks about judicial officers further has the potential of damaging their reputation and the legal system itself." The court stated that parties and opposing counsel had presented evidence of the personal and economic losses Rose's misconduct imposed upon them.

¶55  Because Rose left the first hearing and did not appear at the second hearing, she presented no evidence of mitigating factors. Judge Hansen, nevertheless, concluded that some mitigating factors were apparent on the record: Rose's relative inexperience and lack of supervision and mentorship at the time she violated the rules. "However," Judge Hansen wrote, "the Court does not give great weight to these factors because Ms. Rose persisted in her misconduct for several years, even after multiple judges in different courts admonished her that her conduct did not comply with the Utah Rules of Professional Conduct." Judge Hansen noted that ten years had passed since Rose had been notified that there was an informal complaint against her but that she had persisted in "the same type of misconduct and activities" that had given rise to the complaint.

¶56 Conversely, the district court found evidence of the following aggravating factors: (1) dishonest or selfish motive; (2) pattern of misconduct; (3) multiple offenses; (4) obstruction of the disciplinary proceeding by intentionally failing to comply with rules

or orders of the disciplinary authority; (5) submission of false evidence, false statements, or other deceptive practices during the disciplinary process; (6) refusal to acknowledge the wrongful nature of the misconduct involved, either to the client or to the disciplinary authority; and (7) lack of good faith effort to make restitution or to rectify the consequences of the misconduct involved.

¶57   For example, Rose had been sanctioned by the state district court, the United States District Court, and the Tenth Circuit Court of Appeals, and had been enjoined from filing further actions in either of the federal courts unless she complied with strict conditions. But, as the district court noted, she continued on with her "continuous and extensive" "extreme litigious conduct." Furthermore, the district court commented that Rose seemed to be motivated by factors outside of her clients' best interests in refusing to accept court orders when courts ruled against her. The district court noted that "her actions had very little to do with obtaining relief for her clients and [were] more about winning at all costs and obtaining her share of any monetary award." Rose "repeatedly stated that she is the real victim in this case," which the court believed was evidence that "she does not appreciate the wrongful nature of her conduct." The court opined that Rose's refusal to pay any of her sanctions to opposing parties evidenced her lack of good faith effort to make restitution.

¶58   The district court determined that regardless of whether the presumptive sanction was disbarment or suspension, due to "minimal mitigating factors and compelling aggravating factors," disbarment was ultimately the appropriate sanction.

¶59   Rose appeals the district court's order. We have jurisdiction under the Utah Constitution. UTAH CONST. art. VIII, § 4; *see also* Utah Code § 78A-3-102(c).

**STANDARD OF REVIEW**

¶60   Our state constitution gives this court "plenary authority to govern the practice of law. This authority is derived both from our inherent power and—since 1985—explicit and exclusive constitutional power." *Injured Workers Ass'n of Utah v. State*, 2016 UT 21, ¶ 14, 374 P.3d 14; UTAH CONST. art. VIII, § 4 ("The Supreme Court by rule shall govern the practice of law, including . . . discipline of persons admitted to practice law."); *see Barnard v. Utah State Bar*, 804 P.2d 526, 528 (Utah 1991) ("[T]he authority of this Court to regulate the admission and discipline of attorneys existed as an inherent

power of the judiciary from the beginning."); *In re Burton,* 246 P. 188, 199 (Utah 1926) ("[This court's] power to deal with its own officers, including attorneys, is inherent, continuing, and plenary, and exists independently of statute . . . .").

¶61   "Given our 'constitutional mandate[,] "the unique nature of disciplinary actions and our knowledge of the nature of the practice of law,"' we apply a somewhat modified standard of review." *In re Discipline of Bates*, 2017 UT 11, ¶ 17, 391 P.3d 1039 (alteration in original) (quoting *In re Discipline of Babilis*, 951 P.2d 207, 213 (Utah 1997). "While we will 'ordinarily presume findings of fact to be correct and will not overturn them unless they are arbitrary, capricious, or plainly in error,' we accord them less deference in matters of attorney discipline." *Id.* (citation omitted). "We maintain the discretion to draw different inferences from the facts than those made by the district court," even though that will not always be the case. *Id.* "Additionally, given our unique position regarding attorney discipline, we 'make an independent determination as to' the correctness of the level of discipline actually imposed, 'although we always give serious consideration to the findings and [rulings] of the [district court].'" *Id.* (alterations in original) (citations omitted).[8]

_____

[8] This case presents a wrinkle on our statement that "we 'make an independent determination as to' the correctness of the level of discipline actually imposed." *In re Discipline of Bates*, 2017 UT 11, ¶ 17, 391 P.3d 1039 (citation omitted). Here, Rose has not explicitly asked us to determine whether the district court erred in finding that disbarment was the appropriate sanction. Our oft-repeated statement that we make an independent determination could be read as a declaration that we will *sua sponte* consider the appropriateness of a sanction. But it is not. We make an "independent determination" by affording no deference to the district court's decision. We do not make a determination independent of a request supported by an adequately briefed argument.

## ANALYSIS[9]

### I. Rose's Briefing is Wholly Inadequate

¶62   Though Rose's arguments are barely articulable, legally unsupported, factually unsupported, and fail to provide citations to the 28,000-page record, we nevertheless do our best to respond to what she appears to have given us: jurisdictional complaints referencing the Supremacy Clause and principles of *res judicata*, and claims of federal due process and equal protection violations.

¶63   We note at the outset that Rose does not explicitly base an argument on the claim that she did not commit the underlying violations the district court found she committed by entering default.[10] Nor does she explicitly claim that the sanctioning court applied the wrong sanction to her professional conduct violations. Instead, Rose launches a broadside attack of Utah's attorney discipline system.

¶64   We also want to make plain that while we will do our best to respond to the substance of Rose's claims, her arguments are inadequately briefed. We recently clarified our briefing requirements in *Bank of America v. Adamson*, 2017 UT 2, 391 P.3d 196. There we quoted Utah Rule of Appellate Procedure 24(a)(9), requiring an appellant's brief to "contain the contentions and reasons of the appellant with respect to the issue presented . . . with citations to the authorities, statutes, and parts of the record relied on." *Id.* ¶ 11 (alteration in original). While we reiterated that "[a]n issue is inadequately briefed if the argument 'merely contains bald citations to authority [without] development of that authority and reasoned

---

[9] Neither Rose nor the Office of Professional Conduct relies upon an older version of the code or argues that citing an older version of either the Utah Code or any other law would make a difference to our resolution of this appeal. We thus cite the current version of the law.

[10] To be clear, it is abundantly apparent that Rose believes that her conduct in the Federal and State Cases was beyond reproach. Rose does not, however, attempt to argue how the district court erred in concluding that her conduct violated the Rules of Professional Conduct. Nor does she explicitly argue that the district court erred in striking her answer.

analysis based on that authority,'" we also explained that "inadequate briefing [was no longer] an absolute bar to review of an argument on appeal." *Id.* (first and second alterations in original) (citations omitted). That is because

> there is a spectrum of how adequately an argument may be briefed. On one end, an issue may be argued in only one sentence without any citations to legal authority or to the record. On the other, there may be dozens of pages of argument including volumes of authority and citations to the record regarding a single issue. Defining the exact point at which a brief becomes adequate is not possible, nor is it advisable, as each issue is different and may require different amounts of analysis and argument.

*Id.* We concluded by adopting *State v. Nielsen*'s language respecting an appellant's duty to marshal the evidence: "We clarify that there is not a bright-line rule determining when a brief is inadequate. Rather, [a party] who fails to adequately brief an issue 'will almost certainly fail to carry its burden of persuasion on appeal.'" *Id.* ¶ 12 (quoting *State v. Nielsen*, 2014 UT 10, ¶ 42, 326 P.3d 645). We continued, "from here on our analysis will be focused on the ultimate question of whether the appellant has established a [sufficient argument for ruling in its favor]—and not on whether there is a technical deficiency in [briefing] meriting a default." *Id.* (alterations in original) (citation omitted).

¶65   We, however, provided some guidance to parties wishing to improve their chances of meeting that burden of persuasion. We emphasized "the importance of a party's thoughtful analysis of prior precedent and its application to the record." *Id.* ¶ 13. We also instructed that a "party must cite the legal authority on which [an] argument is based and then provide reasoned analysis of how that authority should apply in the particular case, including citations to the record." *Id.* And we cautioned that a party who "fails to devote adequate attention to an issue [will] almost certainly . . . fail to meet its burden of persuasion." *Id.* How much attention is adequate will vary issue by issue and case by case. *2010-1 RADC/CADC Venture, LLC v. Dos Lagos, LLC*, 2017 UT 29, ¶ 30, --- P.3d --- ("Of course, it is not the size of an argument that matters. Some parties adequately brief an argument in a well-crafted paragraph. Others manage to inadequately brief an argument in fifty pages."). But at the very least, an argument should clearly identify the contention, cite

supporting authority, distinguish contrary authority, cite pertinent facts in the record (and provide citations to the record so opposing counsel and the reviewing court can find them), analyze the facts through the lens of the cited law, and explain what the result should be. This is the floor upon which any argument should stand.

¶66 Against this backdrop, we will do our best to articulate and then respond to Rose's contentions. But our efforts should not be interpreted as an acknowledgement that Rose has adequately briefed any of the arguments she has raised. She has not. As we sort through Rose's arguments, we add our voice to the chorus of courts who have found Rose's briefing to be "bizarre" and "utter[ly] incomprehensibl[e]." In other words, Rose's briefing falls well below the standard we expect from those who practice before this court. And though she raises many claims, she has not met her burden of persuasion in arguing any of them.

## II. The Utah District and Utah Supreme Courts Have Jurisdiction to Consider Whether Rose's Conduct in Both State *and* Federal Court Violated Utah's Rules of Professional Conduct

¶67 Rose's main contention is that we do not have jurisdiction over this case for a number of reasons. Of jurisdiction, Chief Justice John Marshall wrote that "[w]e have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given." *Cohens v. Virginia*, 19 U.S. 264, 404 (1821). Thus, where we have jurisdiction we cannot give it up, no matter how "gladly [we would] avoid" it. *Id.*

¶68 Rose contests our ability to address her actions in the Federal Case because, she claims, the Supremacy Clause prohibits us from exercising jurisdiction over discipline arising from her conduct in federal and Navajo courts. Rose specifically claims that, under the Supremacy Clause, "there is no legal basis for Utah Courts to have any jurisdiction to base a disbarment upon questions of law prohibited to Utah Courts to address, here, defining the contours of Navajo Nation Courts' jurisdiction over non Indians." She further argues that OPC and district court judges "have not produced any law supporting this Court having jurisdiction to define Indian Nation jurisdiction . . . particularly given . . . [the] Supremacy clause to which this State agreed to abide by in exchange for statehood, as did all the original colonies also." Thus, Rose seems to believe that because she practiced in federal and Navajo courts, the State of Utah

has no business basing sanctions upon violations of the Utah Rules of Professional Conduct that are alleged to have occurred there. She calls our jurisdiction in this case an invasion of "US and [Navajo Nation] sovereignty."

¶69 "There is no doubt that the district court ha[s] subject-matter jurisdiction over . . . disciplinary action[s] . . . ." *In re Discipline of Oliver*, 2011 UT 29, ¶ 9, 254 P.3d 181. "A court has subject matter jurisdiction if the case is one of the type of cases the court has been empowered to entertain by the constitution or statute from which the court derives its authority." *See id.* ¶ 8. Utah's constitution gives the Utah Supreme Court absolute authority to regulate the practice of law for those licensed here. *See supra* ¶¶ 60–61. And we have said that "[t]he district courts of this state have unquestioned authority to adjudicate matters of attorney discipline." *Oliver*, 2011 UT 29, ¶ 9; Utah Code § 78A–5–102(3) ("The district court has jurisdiction over matters of lawyer discipline consistent with the rules of the Supreme Court."). Thus, the district court had jurisdiction to hear Rose's attorney discipline case, and we have jurisdiction to consider her appeal from it.

¶70 Rose appears to contend, without citing any supporting law, that the Supremacy Clause divests our jurisdiction over discipline cases when the actions giving rise to the discipline occur in federal or tribal court. Rather than cite cases, Rose provides an analogy. Rose explains that while Utah courts have jurisdiction to hear divorce cases, they do not have jurisdiction to hear Alaskan divorce cases. But this analogy misses the point. The question of whether we have jurisdiction over Rose's discipline case is different from whether we would have had jurisdiction to hear the underlying case. We do not have jurisdiction to hear an Alaskan divorce case; we do, however, have jurisdiction over a Utah attorney who commits a breach of the rules of professional conduct while practicing in Alaska. Our Rules of Professional Conduct provide that a "lawyer admitted to practice in this jurisdiction is subject to the disciplinary authority of this jurisdiction, regardless of where the lawyer's conduct occurs." Utah R. Prof'l Conduct 8.5(a).

¶71 And Utah is not alone in this. Our rule is based upon the ABA Model Rules of Professional Conduct, rule 8.5(a), which reads

> A lawyer admitted to practice in this jurisdiction is subject to the disciplinary authority of this jurisdiction, regardless of where the lawyer's conduct occurs. . . . A lawyer may be subject to the disciplinary authority of

> both this jurisdiction and another jurisdiction for the same conduct.

As of 2016, twenty-two states had adopted this rule verbatim; and twenty-seven jurisdictions, including the District of Columbia, had adopted a modified version of this rule. AM. BAR ASS'N., VARIATIONS OF THE MODEL ABA RULES OF PROFESSIONAL CONDUCT, Rule 8.5 (Aug. 15, 2016), https://www.americanbar.org/content/dam/aba/admin-istrative/professional_responsibility/mrpc_8_5.authcheckdam.pdf.

¶72   Although we have not addressed an argument like the one Rose appears to make, Colorado has rejected a similar argument. *See People v. Rozan*, 277 P.3d 942, 948 n.12, 949 (Colo. O.P.D.J. 2011). In *Rozan*, an attorney—Steven Rozan—was licensed to practice law in both Texas and Colorado. *Id.* at 946. Rozan and his practice were housed in Texas, but his client resided in a federal penitentiary in Colorado called ADMAX. *Id.* at 945. The Presiding Disciplinary Judge (PDJ) of the Colorado Supreme Court and the Hearing Board prosecuted Rozan for knowingly taking his clients funds for his personal use. *Id.* at 946. Rozan contested Colorado's jurisdiction, reasoning that Colorado lacked jurisdiction both (1) for acts that took place in Texas and (2) for actions taken while representing a client who resides in a federal enclave—like ADMAX. *Id.* at 946–48. In determining that it did have jurisdiction, the PDJ cited Colorado's Rule of Professional Conduct 8.5(a), which provides—like our own rule 8.5—that "[a] lawyer admitted to practice in this jurisdiction is subject to the disciplinary authority of this jurisdiction, regardless of where the lawyer's conduct occurs." *Id.* at 947 (alteration in original). The Colorado court concluded that the "regulation of attorney conduct is a matter of state sovereignty." *Id.* at 949. It further concluded that Rozan "is licensed to practice law in Colorado and this proceeding concerns his practice of law. As such, the fact that [he] practiced from an office in Texas does not divest the Colorado Supreme Court, the PDJ, or the Hearing Board of jurisdiction over this matter." *Id.* at 947. Thus, the Colorado Supreme Court determined that it had jurisdiction to discipline Rozan for his conduct no matter where it may have occurred. *Id.* at 949; *see also In re Winstead*, 69 A.3d 390, 396 (D.C. 2013) (holding that attorney licensed in D.C. but practicing in other jurisdictions "is subject to the disciplinary authority of [the D.C.] jurisdiction, regardless of where [her] conduct occurs." (second alteration in original) (citing D.C. R. PROF'L CONDUCT 8.5(a)); *In re Juarez*, 24 P.3d 1040, 1067 (Wash. 2001) (noting that an attorney who practices exclusively in federal court is

required to adhere to the state rules promulgated by the jurisdictions in which they are licensed).

¶73 We have jurisdiction to hear and determine attorney discipline cases even for conduct occurring in federal court. Rose's jurisdictional arguments, in addition to being inadequately briefed, are unavailing.[11]

### III. Neither Article III of the United States Constitution Nor Principles of *Res Judicata* Bar Our Consideration of Rose's Conduct in this Case

¶74 Rose also appears to contend that because the federal court and Navajo Nation Court did not sanction her, neither should this court. Rose argues that this case is opposing counsels' attempt to get a second bite at the apple after their sanctions motions were denied. Rose contends that when opposing counsel in the federal court action did not convince a court to sanction her, they referred the matter to OPC. Rose wraps what is in essence a *res judicata* question in a jurisdictional cloak and argues that Utah has no "federal question jurisdiction" to revisit issues litigated in Navajo and United States Courts. But her legal argument in support spans a lonely sentence: "Of course ruling for this Appellant means giving claim and issue preclusion to retrying Navajo and Federal Court orders in state courts." This sentence hardly qualifies as adequate briefing.

¶75 Usually when an appellant argues claim or issue preclusion—or both, as Rose seems to—we anticipate an analysis of the elements of one or both of *res judicata*'s "two distinct doctrines." *Snyder v. Murray City Corp.*, 2003 UT 13, ¶ 33, 73 P.3d 325.

> Claim preclusion involves the same parties or their privies and the same cause of action. It "'precludes the relitigation of all issues that could have been litigated as well as those that were, in fact, litigated in the prior action.'" In contrast, issue preclusion, also known as collateral estoppel, "arises from a different cause of action and prevents parties or their privies from

---

[11] Even if we were to credit Rose's Supremacy Clause argument, nothing she raises would have prevented Utah's courts from exercising jurisdiction over the allegations arising from Rose's State Court case.

> relitigating facts and issues in the second suit that were
> fully litigated in the first suit." In effect, once a party
> has had his or her day in court and lost, he or she does
> not get a second chance to prevail on the same issues.

*Buckner v. Kennard*, 2004 UT 78, ¶ 12, 99 P.3d 842 (citations omitted).

¶76 Rose does not even attempt to explain how either issue or claim preclusion applies in her case. Rose does point us to instances in the record where requests for sanctions and fees in the Federal Case were denied for various reasons. But she does not describe the substance of those decisions, explain the basis for the request for those sanctions, articulate why resolution of the sanctions motion would preclude a subsequent OPC action based upon the same conduct (if it is the same conduct—Rose doesn't tell us), or cite any authority for the proposition that *res judicata* would adhere in this circumstance.[12]

¶77 And Rose has failed to argue whether there is a difference between a court's ability to sanction an attorney for bad behavior under any other number of rules and a state's responsibility to oversee the practice of law by those practicing within its jurisdiction. Although there may be an interesting *res judicata* question lurking in Rose's briefing, she has made absolutely no effort to develop that question, either factually or legally. Rose has failed to meet her burden of persuasion that either Article III of the United States Constitution or the principles of *res judicata* prevent this court from sanctioning her for conduct she engaged in before the federal courts.[13]

---

[12] It is also worth noting that Rose has been sanctioned more than once. The Tenth Circuit sanctioned Rose "for filing a frivolous and vexatious appeal" when Rose sued the state of Utah in federal court for holding disciplinary hearings in this matter. *Rose v. Utah*, 399 F. App'x 430, 439 (10th Cir. 2010). It sanctioned her $5,000 and awarded opposing counsel "double costs, pursuant to Rule 38." *Id*.; *see* FED. R. APP. P. 38. The federal district court later also enjoined Rose from filing any future lawsuit before it "on her own behalf."

[13] Again, even if we credited this argument, it would not apply to the sanctions arising out of Rose's State Court actions.

#### IV. Rose Has Not Shown that She Was
#### Denied Equal Protection Under the Law

¶78 Rose argues that under the 1984 Amendment to article VIII, section 4 of the Utah Constitution, lawyers are treated differently than non-lawyers with respect to their property interests in their professional licenses. Rose first contends that, under the Fourteenth amendment, all lawyers are entitled to Fifth Amendment Due Process rights, which protect "the dignity of the office the lawyer holds." She next explains that because "lawyer discipline has no three-branch control or oversight or limitations. . . . the 1984 Amendment deprives all Utah Lawyers as a class of Equal Protection afforded all other Utah citizens as to their property rights, here, in professional licenses." She finally declares that "[w]ithout U.S. Constitutionally comporting delegation of authority to the [Utah Supreme Court], the entire system is void for lack of Due Process and Equal Protection under the U.S. Constitution."

¶79 The 1984 Amendment states that "[t]he Supreme Court by rule shall govern the practice of law, including admission to practice law and the conduct and discipline of persons admitted to practice law." UTAH CONST. art. VIII, § 4. This provision effectively removes the power to oversee the practice of law and attorney discipline from the legislative and executive branches. *See, e.g.*, *Injured Workers Ass'n of Utah v. State*, 2016 UT 21, ¶ 26, 374 P.3d 14 ("Although the constitution permits legislative oversight of the supreme court's rules of procedure and evidence, there is no such limitation on the supreme court's authority to govern the practice of law."); *In re Discipline of Harding,* 2004 UT 100, ¶ 18, 104 P.3d 1220 ("[A]ttorney discipline proceedings, being the exclusive province of this court, are conducted under the rules and directions we give."); *Barnard v. Sutliff,* 846 P.2d 1229, 1237 (Utah 1992) ("[O]nly this court has the rule-making power over the practice of law and the procedures of the Bar."). Rose complains that this provision—in some way that she fails to articulate—violates principles of equal protection.

¶80 At the risk of sounding pedantic, a federal equal protection argument should at the very least reference the text of the Equal Protection Clause of the United States Constitution, as well as the case law interpreting that clause. *See supra* ¶ 65. Rose references neither. The Equal Protection Clause reads

> No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of

> life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

U.S. CONST. amend. XIV, § 1. "[S]tate laws must 'treat similarly situated people alike unless a reasonable basis exists for treating them differently.'" *State v. Lafferty,* 2001 UT 19, ¶ 70, 20 P.3d 342 (citation omitted). "[W]e must determine what classifications are created by the statute, whether they are treated disparately, and whether the disparate treatment serves a reasonable government objective." *State v. Merrill*, 2005 UT 34, ¶ 31, 114 P.3d 585. "The general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985). And the United States Supreme Court

> ha[s] treated as presumptively invidious those classifications that disadvantage a "suspect class," or that impinge upon the exercise of a "fundamental right." With respect to such classifications, it is appropriate to enforce the mandate of equal protection by requiring the State to demonstrate that its classification has been precisely tailored to serve a compelling governmental interest.

*Plyler v. Doe*, 457 U.S. 202, 216–17 (1982) (citations omitted). But "[w]here no suspect classification or violation of a fundamental right is involved, a difference in treatment 'need be only rationally related to a valid public purpose' to withstand equal protection scrutiny." *State v. Holm*, 2006 UT 31, ¶ 99, 137 P.3d 726 (citation omitted).

¶81 Rose fails to explain her equal protection argument and simply asserts that "[t]here is no governmental interest in removing the three branch safeguards on lawyers' interests, over say medical doctors, or dentists, or others dealing with the most personal aspects of Utah citizens." It should go without saying that merely identifying classes is not enough to demonstrate an equal protection violation. Rose has failed to explain what level of scrutiny should apply, or why, assuming rational basis review, there is no rational basis for treating attorney licensing differently than that of other professions. Rose makes no effort to articulate her argument other than to assert that attorneys are treated differently than other professionals and declare an equal protection violation.

¶82 In short, Rose does not develop an equal protection argument that we can respond to. Rose has, thus, failed to meet her burden of persuasion that her equal protection rights were violated by our constitutional provision delegating attorney discipline authority to our court.

### V. Rose Has Not Shown that the Lawyer Discipline Rules Violated Her Due Process Rights

¶83 Rose further argues that Utah's "lawyer discipline rules" violate due process under the Fifth and Fourteenth Amendments of the United States Constitution.

¶84 We have recognized that attorneys are entitled to due process when faced with professional discipline. In *In re Discipline of Schwenke*, we stated that "suspension and disbarment proceedings call for adherence to minimum requirements of procedural due process, including notice of a hearing and notice that the attorney's license has been restricted or withdrawn." 849 P.2d 573, 576 (Utah 1993). In *Long v. Ethics and Discipline Committee*, we stated that an attorney is entitled to "receive adequate notice of the charges 'and an opportunity to be heard in a meaningful way.' But the level of due process required depends on the context of the proceeding. . . . '[D]ue process is flexible and calls for the procedural protections that the given situation demands.'" 2011 UT 32, ¶ 29, 256 P.3d 206 (citations omitted). And "[i]n the context of informal attorney discipline, we have stated that the procedures listed in the [Rules of Lawyer Discipline and Disability] are sufficient to afford due process." *Id*.[14]

---

[14] In *In re Discipline of Harding,* we explained that due process is satisfied at the screening panel proceeding because the Rules of Lawyer Discipline and Disability provide that the attorney has "prior notice of the charges, notice of the hearing, a right to be present at the hearing, and to be represented by counsel at the hearing"; "the right to appear and present testimony, offer witnesses on [one's] own behalf, and present an oral argument with respect to the complaint"; the ability to receive the screening "panel's findings and conclusions"; and the opportunity to seek review from the Committee Chair. 2004 UT 100, ¶ 20, 104 P.3d 1220. Because the lawyer discipline rules provide an attorney with all of the above enumerated procedural mechanisms, we determined that "[t]hese

(continued . . .)

¶85   Rose, however, recites factors recognized by federal courts, claiming "[t]hese standards are followed by all United States Courts that have their own lawyer discipline panels":

1) an adversarial system including pre-trial investigation of the charges;

2) linking facts with claims such that there is adequate advance notice to the lawyer to be able to understand  the charges and respond;

3) a declaration of the type of discipline prosecutors seek prior to the lawyer being called upon to answer them;

4) a heightened "clear and convincing standard" of evidence to support the charges, and to support the discipline meted out; and

5) rules and impartial triers to enforce the rules.

But Rose fails to measure our system against any of these factors and explain why she believes Utah's system lacks these protections, or why, to the extent Utah's system does lack one or more of them, the omission violated her constitutional rights. In other words, it is not clear what due process Rose believes she was not afforded. Nor does Rose argue that, even if she believes more process would have been preferable, failure to provide that additional process rises to the level of a violation of her constitutional rights.

¶86   Rose does mention three rules: rules 14-501, -517, and -506 of the Utah Rules of Lawyer Discipline and Disability. But rule 14-501 is the only rule that makes even a brief cameo appearance in one of Rose's arguments. The others don't appear until her conclusion, wherein Rose summarily states that rules -501 and -517 "combined with Rule 14-506 allowing trial judges to be subject to the Prosecutor, deprives all Utah lawyers of impartial triers" of fact. But rule 14-506 *removes*—not subjects—currently sitting judges from the jurisdiction of OPC: "Incumbent and sitting judges are subject to the jurisdiction

---

(continued . . .)

measures are adequate, given the nature of lawyer discipline proceedings, to ensure due process to a lawyer accused of misconduct." *Id*. ¶ 21.

of OPC *only for conduct that occurred prior to the taking of office.*" *Id.* R. 14-506(b) (emphases added). If indeed Rose meant to express that sitting judges are subject to OPC's jurisdiction for things they do as judges, then she was mistaken.

¶87 Ultimately, Rose's flaw is—as we mention above—her total failure to analyze any of the rules she mentions in light of the standards she insists apply. Instead, she states in conclusory fashion that "Utah's system is an inquisition" and "Utah's system is void for lack of . . . Due Process and Equal Protection." Rose needed to explain what additional process she believed she was entitled to and why failure to afford her that process violated her due process rights.[15]

### VI. Rose Also Fails to Show that
### OPC Engaged in Misconduct

¶88 Rose also argues that the judgment against her is void because OPC prosecutors violated her due process rights in two ways: first, the composition of the screening panel was unconstitutional; and second, the prosecutors should not have pressed her case because she believed she was acting in conformity with the rules of another jurisdiction under rule 8.5 of the Rules of Professional Conduct.

¶89 Rose first complains that the composition of her screening panel violated her due process rights. A due process argument should at some point reference the Due Process Clause, cite applicable due process jurisprudence, and perform some sort of due

---

[15] Rose also contends that this court has failed in its "duty to stop any lower court processes lacking jurisdiction, and/or involving prosecutorial misconduct of Rules violations depriving lawyers of Due Process and equal protection [sic]." To the extent Rose is arguing that when issues are brought before us and are properly briefed, and a party meets her burden of establishing that a constitutional or jurisdictional violation exists, that we have a duty to correct the error, we agree. But the only example Rose gives is an unsupported allegation that this court and OPC favor attorneys at larger firms. She provides no analysis to support this bald assertion. It goes without saying that one cannot meet one's burden of proof by making unsubstantiated allegations.

process analysis considering the facts of the present case. *See supra* ¶ 65. Rose skips these steps.

¶90 Rose does raise an issue with respect to the composition of screening panels: "So if the Prosecutors are acting outside any UTSCT, as here, by dividing the Screening Panels in half, by defining a 'Screening panel' the same as a 'quorum,' eliminating '*quorum of a screening panel*.'" This fragment fails to argue anything; it only suggests the topic of her complaint. The Supreme Court Rules on Lawyer Discipline and Disability provide that committee members "shall be divided into four screening panel sections of six members of the Bar and two public members." UTAH R. BAR LWYR. DISC. AND DISAB. Rule 14-503(d). They further provide that "[t]wo members of the Bar plus one public member shall constitute a quorum of a screening panel. The concurrence of a majority of those members present and voting at any proceeding shall be required for a screening panel determination." *Id*. We believe Rose meant to complain that because her panel was comprised of a quorum of three and not a full panel of eight, the composition of her panel violated her due process rights. But we cannot argue Rose's case for her.

¶91 Perhaps more importantly, Rose does not explain how having a quorum instead of a full panel would have voided the judgment against her. In *Ciardi v. Office of Professional Conduct*, an attorney made a similar argument: that defects in the screening panel process deprived the district court of jurisdiction. 2016 UT 36, ¶ 12, 379 P.3d 1287. We refused then to address the merits of his contention because it was inadequately briefed, contained no citation to the record demonstrating preservation in the district court, and did not cite the record below. *Id*. Like the appellant in *Ciardi*, Rose has given us no authority or argument to support the contention that screening panel defects are jurisdictional. And as we did in *Ciardi*, we decline to do that work for Rose.

¶92 Rose also contends that the OPC prosecutor violated her due process rights "knowingly [and] willfully" when he "made the decision to prosecute the case and retry or displace federal and US-[Navajo Nation] Contracted triers." Rose attempts to bolster this argument by quoting rule 8.5(b)(2) of our Rules of Professional Conduct:

> A lawyer shall not be subject to discipline if the lawyer's conduct conforms to the rules of a jurisdiction

34

in which the lawyer reasonably believes the predominant effect of the lawyer's conduct will occur.

Rose, however, does not explain how a decision to prosecute her conduct violated this rule or how a violation of this rule offended due process. She fails to explain which rules she believed she was acting in conformance with or to point to a place in the record where she engaged in actions that arguably violated our rules but conformed to those of the jurisdiction where she practiced. A proper argument is altogether unmade.

¶93   Rose has, therefore, not demonstrated how "Prosecutors became policy makers," how this court "became complicit in this matter," or how the above considerations violated her due process rights under the United States Constitution.

### VII. Rose Has Failed to Show that Our Lawyer Discipline Process Is Void for Various Other Reasons

¶94   Rose finally argues that OPC disobeyed the district court's rule 7 order and failed to disclose the records showing "how or why the initial screening panel did what they did."

¶95   Rule 7 of Utah's Rules of Civil Procedure—we assume, the "Rule 7" Rose intended to reference—is comprised of parts (a)–(q). Its title is "Rule 7. Pleadings allowed; Motions, Memoranda, Hearings, Orders." It governs motion practice in civil cases in the State of Utah. Rose fails to guide us to a place in the record where the district court issued an order under "Rule 7" directing OPC to act one way or another. Claiming that opposing counsel violated a "Rule 7" order without explaining more does little to tell this court what the alleged problem is.

¶96   The closest thing we can find in the record concerning Rule 7 is the district court's memorandum decision and order granting OPC's motion to strike Rose's answer and entering default judgment against her, concurrently denying Rose's motion to strike OPC's motion to strike and dismiss the case as a sanction against OPC for violations of "Rule 7" and other rules.[16] That order does not support

---

[16] This highlights why counsel should adhere to our rule requiring references to the record. Had Rose complied with Utah Rule of Appellate Procedure 24, we could have at least known which

(continued . . .)

Rose's argument that OPC violated a court order concerning a "Rule 7." Years later—as OPC clarifies—the district court, under Judge Hansen, explained to Rose that "the issuance of an order under Rule 7 of the Utah Rules of Civil Procedure merely formalizes a court's ruling and allows the parties to seek appellate review of that ruling." The court further invited Rose to submit "her own proposed order so that she [can] pursue appellate review." We will not scour the record more than we have—and we have—in order to understand the nature of Rose's complaint. We merely note that Rose has not pointed to any district court order directed at OPC that she then argues OPC did not comply with.

¶97   Likewise, Rose fails to explain which documents she believes OPC failed to supply, how this failure harmed her, or what evidence she anticipates the documents would provide. OPC replies that it "produced all documents and materials which are required by the [Rules of Lawyer Discipline and Disability]." OPC further claims that Rose was "provided all materials that were before the screening panel in the two underlying cases. If she believed something [more] was relevant to the district court case she could have produced/required that in discovery, but she elected not to participate in discovery." Rose does not contest this.

¶98   Without more than these unsupported assertions and conclusory claims—not to mention the various aspersions cast on this court and Utah's legal system—Rose has not met her burden of persuasion showing that—as she claims—"dismissal of the case entirely is all that is left."

### VIII. Rose's December 2010 Petition for Extraordinary Relief Was Both Frivolous and Interposed for Delay

¶99   Between 2008–2010, Rose filed a number of Petitions for Extraordinary Relief in this court, attempting to stop the district court proceedings. In 2011, Justice Jill N. Parrish issued the following Order:

> This matter is before the Court on Petition for Extraordinary Relief. Petitioner [Rose] has filed three

(continued . . .)

order—of all the orders in the 28,000+ page record—she claims lies at the heart of this argument.

prior petitions pursuant to rule 19 of the Rules of Appellate Procedure and one prior petition pursuant to rule 5 of the Rules of Appellate Procedure. In response to those requests for discretionary appellate review, this Court has declined to interrupt the pending disciplinary proceedings. This Court again denies the request for relief prior to entry of the final judgment below. Petitioner is entitled to file a direct appeal after the final judgment. Prior to the timely filing of a direct appeal of right, the Court will not entertain another request for discretionary appellate review. With respect to this petition, the sole issue remaining to be decided is the [OPC's] request for sanctions. Resolution of that issue will be deferred. If a timely direct appeal is filed after entry of judgment in the disciplinary proceedings, the issue of sanctions will be consolidated with the appeal for decision after plenary review.

Justice Parrish's order was consolidated into the present appeal on November 22, 2016.

¶100 OPC now renews its request for sanctions against Rose for filing frivolous petitions for extraordinary relief under rule 33 of the Utah Rules of Appellate Procedure. Rule 33(b) states that a brief is frivolous if it "is not grounded in fact, not warranted by existing law, or not based on a good faith argument to extend, modify, or reverse existing law." UTAH R. APP. P. 33(b). And a brief "interposed for the purpose of delay" is one filed for "any improper purpose," including to "gain time that will benefit only the party filing the appeal." *Id.*

¶101 OPC argues that Rose's December 2010 petition was "frivolous, as the Court had already denied her previous attempts to seek discretionary appellate review, and she should not have filed additional attempts to seek review until the entry of a final judgment from which she could seek an appeal." We agree that Rose's December 2010 filing was frivolous, and we also conclude it was filed for the "improper purpose" of gaining time that would "benefit only the party filing the appeal." UTAH R. APP. P. 33(b); *see Brigham City v. Mantua Town*, 754 P.2d 1230, 1237 (Utah Ct. App. 1988) ("We find the appeal to be both frivolous and interposed for delay and hold that Brigham City is entitled to recover an award of reasonable attorney fees and double costs on appeal."). We therefore remand to the district court for the limited purpose of determining the appropriate

award of attorney fees to be granted to OPC in connection with the December 2010 petition.

¶102 Rose further complains that Justice Thomas R. Lee of the Utah Supreme Court "participated with the prosecutors in harming [her]" when he denied a stay of her disbarment pending review of her appeal. That is the sum total of her argument. We will note, in case others find themselves in the same position, that if Rose believed her stay was improperly denied, she would have been better served to articulate a reason why rather than to baselessly and personally attack a justice for signing an order on behalf of the court.

¶103 Given the volume of motions filed and the various requests for action embedded in other pleadings, we take this opportunity to deny all other motions and requests related to this case.[17]

## CONCLUSION

¶104 Rose failed to competently contest the order of the district court disbarring her as a sanction for violating various rules of professional conduct. While we recognize that disbarment is the most serious sanction a court may impose on an attorney for professional conduct violations, we acknowledge that Rose did not challenge the substance of the district court's sanction, opting instead to level constitutional challenges to the entire attorney discipline system. Rose's arguments are inadequately briefed, and to

---

[17] For example, we deny "Appellant's #1 Rule 10(A) Verified Motion for Summary Disposition For Lack of This Court's Subject Matter Jurisdiction – No Tolling Statutes of Limitation Rule 8.5 Violations and Rule 11 and 33 Motion for Sanctions." Rose filed this motion after we held oral argument in this matter. Her motion largely rehashes the jurisdictional arguments discussed herein and augments them with an incomprehensible contention that the statute of limitations has run on the claims against her. Rose posits that the limitations period ended on May 1, 2008, for claims arising out of the Federal Case and on April 18, 2009, for the State Case. OPC filed the Complaint in December 2007. This denial also includes "Appellants #2 Rule 10(A) Verified Motion for Summary Disposition for Lack of this Court's Subject Matter Jurisdiction – And Due Process – Article VIII Sec 4 1985 Revision Violates Utahs [sic] Enabling Act Prohibitions" filed four months after the case was argued.

the extent we can decipher them, they are without merit. We affirm the district court's order.

———————